IN THE MATTER OF STEVEN M. FOLEY.

Suffolk. March 3, 2003. - May 6, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Attorney at Law,* Disciplinary proceeding, Suspension.

In a disciplinary proceeding brought against an attorney for assisting and
encouraging his client in the preparation of a fabricated defense to a
criminal complaint, the appropriate disciplinary sanction to be imposed
was a suspension of three years, where there were no special mitigating
circumstances, and where the conduct at issue was pernicious to the legal
system and highly destructive of public confidence in the integrity of the
legal profession. [333-339]

INFORMATION filed in the Supreme Judicial Court for the county
of Suffolk on May 29, 2002.

The case was heard by *Cowin,* J.

*Michael DeMarco* (*Jeanne E. Demers* with him) for the
respondent.

*John W. Marshall,* Assistant Bar Counsel.

CORDY, J. A single justice of this court ordered that Steven M.
Foley (respondent) be suspended for eighteen months from the
practice of law for assisting and encouraging his client in the
preparation of a fabricated defense to a criminal complaint.
While conceding that his conduct violated the rules of ethical
conduct applicable to attorneys, the respondent appeals the
punishment imposed as being too harsh and "markedly dispar-
ate" from sanctions imposed in similar cases. Because the
conduct at issue is pernicious to our legal system, and highly
destructive of public confidence in the integrity of the legal
profession, we conclude that a suspension of three years is
warranted.

1. *Background.* As part of a broader Federal undercover
investigation into alleged corruption at the Boston Municipal
Court, a special agent of the Federal Bureau of Investigation

In the Matter of Foley.

(FBI), using the pseudonym Thomas Abate, caused himself to be arrested by Boston police for driving while under the influence of alcohol and illegal possession of a handgun.[1] An unloaded .38 caliber handgun was found in the back seat of the agent's rented vehicle, bullets of the same caliber were found in his pocket, and an open and nearly empty bottle of Jack Daniels whiskey was found in the front seat. Following his arraignment on May 25, 1993, in the Boston Municipal Court, the agent hired the respondent to represent him at the suggestion of a court officer who subsequently pleaded guilty in Federal District Court to an indictment charging him with racketeering. The respondent and the agent, now his client, then discussed the case on many occasions during the course of the representation. Those conversations were secretly recorded.[2]

On June 11, 1993, the agent met with the respondent for the first time to discuss the charges and his defense. At this meeting the agent made clear to the respondent that he had owned the gun for some time, and that he knew it was in the vehicle. The respondent indicated that it would be in the agent's best interest to distance himself from the gun, but that the bullets in his pocket would be problematic. The agent then inquired about testifying falsely with regard to how the gun came to be in his rented vehicle, and the respondent expressed no reservations about his doing so.[3]

During a subsequent telephone conversation on July 6, the

[1] The Boston police were not aware that Thomas Abate was an undercover agent working for the FBI.

[2] The agent made thirty-eight audiotape recordings of conversations with the respondent.

[3] The agent and the respondent engaged in the following pertinent discussion during their meeting on June 11:

THE RESPONDENT: "See the problem . . . from the technical point of view is somehow distancing you from the gun. Which is why I asked about the car."

THE AGENT: "It's a rental car. Hey I was out . . . I, I stopped. I don't lock a car. What is this, it's not my fuckin' car. What am I gonna lock it. . . . If I stopped a few places, you know what I'm sayin'?"

THE RESPONDENT: "Yeah. That's not a problem. Those things there aren't the problem. What we have though is a situation where when they do find the gun, it's unloaded but they find the bullets in your pocket. So all they have to prove is that you knew the gun was there and you had dominion and control over it and that you . . . ."

respondent told the agent that he had planted the seeds for a fabricated defense in his initial conversation with the prosecutor, and that he would convey the details of the story to the prosecutor at a later meeting after they were more fully concocted.[4] Between July 6 and July 23, the respondent proceeded to fabricate a scenario to explain how the gun came to be in the agent's rented vehicle, and met with the prosecutor to present that fabricated scenario to him.[5]

THE AGENT: "Well can we think of a way that maybe . . . the gun got in the car and . . . ?"

THE RESPONDENT: "And that you didn't know what to do and were takin' the bullets out of it so that you could turn it over to the police. Yeah, but you gotta make somebody believe that one."

THE AGENT: "Well I didn't say it would be easy."

THE RESPONDENT: "The thing is this. The . . . ."

THE AGENT: "See I was gonna bullshit ya when I came in. But I mean, you know, [the court officer] said you're you know . . . a good guy and you can you know . . . handle things like this. And I'm gonna tell ya straight. I mean I coulda said somethin' like . . . hey my car's parked in the basement over at the Devonshire . . . unlocked all the time. And I was out and I stopped at a light and BOOM it slides out from under the seat. What do I know from not. I thought it was a toy."

THE RESPONDENT: "That's fine except for the bullets. How do you get the bullets in your pocket?"

THE AGENT: "Ahh . . . I was a safe person? (laughter)"

THE RESPONDENT: "That's the . . . therein lies the problem."

THE AGENT: "Mmm."

THE RESPONDENT: "That's . . . that's the . . . if not for the bullets . . . That's why I'll see what the police report says. If, if, it weren't for the bullets, there'd be very little problem. Now they do have . . . there's an initial problem."

[4]The agent and the respondent engaged in the following dialogue during their telephone conversation on July 6:

THE RESPONDENT: "[W]hat I told [the prosecutor] right from the beginning before we even started . . . I said I'm not going to get into it now but you won't believe the, the story behind the story of this case. So he doesn't know what that is yet, but he does know that there's something bizarre here."

THE AGENT: "Okay, good so that's when we'll come up with that story right?"

THE RESPONDENT: "Exactly."

THE AGENT: "Okay."

[5]The prosecutor's notes from that meeting with the respondent do not indicate a date, but they do reflect elements of the fabricated story that the respondent then described in more detail to the agent on July 23. The

On July 23, the respondent met with the agent to prepare for the trial that was scheduled for July 26. He described the false story that he had made up and told to the prosecutor, and instructed the agent on how to give false testimony in support of that story which was essentially as follows: the handgun actually belonged to a man the agent met for the first time at Zito's, a bar in Boston located across the street from the agent's apartment; the two men drove from Zito's to the Combat Zone area of Boston in the agent's rented vehicle; the man left the gun in the vehicle after the agent convinced him it would be unsafe to carry it in the Combat Zone; so as not to leave a loaded gun in the car, the agent put the bullets in his pocket; the men eventually parted ways in the Combat Zone; the agent picked up a bottle of Jack Daniels whiskey at a nearby package store; the agent got lost trying to drive from the Combat Zone back to his apartment; in frustration, the agent stopped his vehicle and rested until the police picked him up. In order to bolster the credibility of the false testimony that the agent was to give at trial, the respondent repeatedly encouraged the agent to familiarize himself with the scene in the Combat Zone and to imagine somebody to describe as the man who owned the gun.[6]

Later on during the July 23 meeting, the agent expressed reservations about going to trial on July 26, and asked if the

prosecutor's notes read as follows: "Drinking at Zito's. Go to Zone in Abate's car. Gun was Abate's friend [*sic*]. Jack Daniels. Takes bullets out of the gun and puts them in his pockets. Pulled them out at booking desk." In addition, during his conversation on July 23 with the agent, the respondent indicated that he had told the fabricated story to the prosecutor. See *infra*.

[6]The agent and the respondent engaged in the following lengthy conversation on July 23, which included the following pertinent discussion:

THE RESPONDENT: "*Now, the story I have weaved with the district attorney* because . . . the bottom line is this, but I . . . you have to make the gun, explain the gun. Now, if it was a rental car, which it was, and you didn't have the bullets in your pocket that wouldn't be a problem because the judge could say 'well how did he know the was gun there?' The fact that you've got five bullets for a five-shot gun in your pocket and those bullets happen to be the same caliber as that gun in the back seat, makes for a rather compelling argument from the prosecutor that you knew the gun was there. There's no way you can rebut that the gun was there. That you knew it was there. The fact that you knew it was there and that it was there and the car was rented to you . . . ." (Emphasis added.)

THE AGENT: "Are you telling me that we're going to lose this thing?"

respondent could get the matter postponed. The respondent, in

THE RESPONDENT: "[N]o, no, no leads to the proposition that you have to have some other explanation for the gun being there. They cannot trace the gun to you, correct?"

THE AGENT: "Correct."

". . .

THE RESPONDENT: "*Now the story is going to be* . . . we're stuck with certain facts. The facts that we cannot change are that your car was parked partially on the sidewalk down at Post Office Square." (Emphasis added.)

THE AGENT: "Right."

". . .

THE RESPONDENT: "We have to admit that."

THE AGENT: "[N]ow am I going to have to testify in this thing."

THE RESPONDENT: "You may, that's why we'll get to that that's why I want to go over this with you to see to plot out our strategy to get it done. The fact that the bullets were found in your pocket is incontroversal [*sic*], you can't make that go away, they've got the bullets. They're in the police report, they'll have them on Monday. The fact that they found the gun . . . . So, those are the things we cannot change. The fact that you were drunk, we're not contesting that, we're using that as a defense in essence, in the case. But the only way that you can, can make this . . . have any possibility of having this case go away is to have the judge believe that there was somebody else involved who had a gun. Now, how is that done? You live across the street from Zito's. Everybody up at that court knows what Zito's is, they know it's a bar. That know that the bar is across the street and it's a nice place, it's not a dive. You can be in Zito's drinking the night that you were arrested, the night before you were arrested."

THE AGENT: "Uh hum."

THE RESPONDENT: "And you could have met somebody in Zito's and then decided to drive down to the Zone. You did spend some time, in some part of the Zone?"

THE AGENT: "Yeah."

THE RESPONDENT: "Now, you could have observed this person to have had a gun when you got in, when that person got into your car which was parked at the Devonshire. When you see it, you're smart enough because you been around for awhile, to know that carrying a gun in the Combat Zone is a very dangerous thing to do. You'd also been drinking up until this point in time. Which means that if you're drinking your judgment isn't perfect. But, you know you don't want a guy with a gun who you don't know to have that gun in the Combat Zone. So what do you do, you say, look, leave the gun in the car. You're not going to leave a loaded gun in the car that could be dangerous, you take out the bullets."

THE AGENT: "And you've already told this to Mr. —"

THE RESPONDENT: "What? I told him that there was a story, he knows part of it but he doesn't know all of it."

THE AGENT: "Okay."

the agent's presence, then telephoned the prosecutor, told him

THE RESPONDENT: "Okay, so now we've got a gun in the car. We understand. We don't know if there's anything about the serial numbers being obliterated."

THE AGENT: "Now, I mean, if they're going to ask me who's this other guy, the person."

THE RESPONDENT: "Yeah, how are you going to know, you just met that person. So what you have to do is think of somebody to describe."

THE AGENT: "Just a first name?"

THE RESPONDENT: "And the name."

THE AGENT: "Just the first name?"

THE RESPONDENT: "Jerry, Paul, Dave. You met this guy. You don't have to give a last name. He was in there drinking, I was in there drinking, we started talking and went down to the Zone. He had the gun, I told him to leave the gun in the car, he didn't want to do it."

THE AGENT: "I'm catching well see that, that may play out good because you know I don't know my way around and he said come on, let's go someplace, and I say where are we going and he said the Zone and I said oh, I heard of that that's the Combat Zone, right? And he goes yeah. And he said don't worry I got a gun, and I say no, no hey we don't need any guns here, we're big guys, we don't need any, okay."

THE RESPONDENT: "You know enough, I mean you're street smart enough to know that you don't bring a gun into an adult entertainment district, it's dangerous."

THE AGENT: "Right, right, okay, I'm catching on, alright."

THE RESPONDENT: "So, you leave the gun in the car. You're in the Zone and he goes off, on his merry way. Gets lucky, so to speak, and you then, now [you], you come out of the Zone at some point in time, before 11 o'clock, because you have to get the bottle."

THE AGENT: "Right, okay."

THE RESPONDENT: "There's a package store, there's gotta be a package store down in the Combat Zone."

THE AGENT: "Okay."

THE RESPONDENT: "But what you gotta be able to do, and this is important, even if this has to be between now and then, know the names of some of the places down there. Have you ever been in any of them?"

THE AGENT: "Ah, you know probably with Timmy, probably, 'cause I like I said I know some of the —"

THE RESPONDENT: "Go to someplace between now and Monday so you can describe what it looked like inside. The D.A. is not stupid. He'll ask you the name of the place, describe what it looked like, what shape was the bar. So you're gonna have to have an answer, okay?"

THE AGENT: "Alright."

THE RESPONDENT: "So that you can say you were in a bar, you came out, you remember buying the bottle of Jack Daniels. Then, what happened after that, you don't. . . . I mean, you really . . . package stores close until 5:00 when

(falsely) that his client was out of town for a couple of weeks,

you're picked up."

THE AGENT: "Right, right."

THE RESPONDENT: "Do you have any memory of what you did during that period of time? That we can make go away."

THE AGENT: "I was with a broad that's where I was. Yeah."

THE RESPONDENT: "Well, you can tell them that. I mean that's okay. You can explain that. I mean you can explain that, that he took off and he went someplace and you went someplace. You had the car, he didn't and ah, you know, that's not a major problem. It's something that, I guess it's even better because if the judge sees that you're a human, that you were, that you were drunk, you screwed up, you made mistakes, then you wind up gettin', you get stopped."

". . .

THE RESPONDENT: "The D.A. is trying, he, you know, he's the one once when I told him, I said ya the bottle of booze, he said where did he get the booze, I said down in the Zone, yeah but that had to be before 11 o'clock."

THE AGENT: "So he's already thinking this stuff. Ya, well, not necessarily, I mean hey, I pick a bottle up, I had it sitting in the car, you know I had a bottle up in my apartment, a little bottle up in my apartment, I mean I —"

THE RESPONDENT: "But then you can't say that you had it in your apartment, 'cause then you would have known how to get back to your apartment."

THE AGENT: "Well from, no, from Zito's I walked up, you know we were gonna go out cruzin [sic] a little bit, I picked up the thing, went down and got in my car."

THE RESPONDENT: "Yeah, but you wouldn't if you were going to a bar, it's gotta follow. You know."

THE AGENT: "Yeah."

". . .

THE RESPONDENT: "[W]hen I was telling [the prosecutor] bits, I didn't tell him the whole story but pieces of it, from the point of leaving the Zone on, he said you know, there's some (inaudible) spots in there, but being down in the Zone, he understands. He didn't view it as a, as a totally incredible picture. That helps."

". . .

THE AGENT: "I just want to make sure that I get this in my mind and work it out, you know."

THE RESPONDENT: "Well that's what I want, what I want you to do is get a good look at the —"

THE AGENT: "I'll take care of that, no problem."

THE RESPONDENT: "[A]t the Combat Zone so you'll understand that. Just have a description of somebody with a gun."

". . .

THE RESPONDENT: "So, the thing is, I want, before we go in there, we better, the story, the Zone, it all parlays into what we want to do, but what you have to do is know a name of a place so that you can describe it because . . . ."

and negotiated a continuance. The case was thereafter continued further until the agent defaulted on November 29, 1993. Prior to that default, in subsequent meetings between the respondent and the agent on September 3 and October 20, the respondent again discussed the fabricated story and how it would be used when the case went to trial.[7]

Parallel to this line of defense, and based on discovery he received from the prosecutor, the respondent also began to pursue a motion to suppress the gun that did not depend on the agent's testimony. The motion to suppress was never heard, however, and the case never went to trial, because the charges were nolle prossed when the Suffolk County district attorney learned the true identity of the agent and that his arrest had been part of an undercover investigation.

2. *Proceedings before the Board of Bar Overseers.* The respondent's misconduct was reported to the Board of Bar Overseers (board) by the United States Attorney's office at the conclusion of its investigation. Bar counsel then brought a petition for discipline before a hearing committee of the board. The tape recordings of the agent's conversations with the respondent were admitted in evidence and played at the committee hearing. The prosecutor and the respondent also testified at the hearing.

---

[7]The agent and the respondent had the following conversation on September 3:

THE AGENT: "Now we're still gonna, it's still the same game plan, so to speak."

THE RESPONDENT: "Oh ya . . ."

THE AGENT: "[A]bout meeting the guy —"

THE RESPONDENT: "Oh ya . . ."

THE AGENT: "[O]ver at Zito's —"

THE RESPONDENT: "We'll get the, we'll get the, the whole story line but now we've got a lot more time to do it."

And on October 20, the agent and the respondent had the following conversation:

THE AGENT: "[W]hat I was going to ask is are we still gonna go with that same game plan of going to the Combat —"

THE RESPONDENT: "Oh yeah, we'll, we'll plot that in, just before the trial of how we're gonna go through the testimony and right that there —"

THE AGENT: "Okay."

THE RESPONDENT: "We'll have a, a dress rehearsal here about your testimony and what you're gonna say."

The agent testified, but only for the limited purpose of authenticating the tape recordings.[8] At the conclusion of the evidentiary hearing, the committee found that the respondent had fabricated a false story for the agent's defense, presented the fabricated false story to the prosecutor, and encouraged the agent to testify falsely in keeping with the fabricated story. It further concluded that this conduct violated S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4) and (6), 382 Mass. 769 (1981),[9] and S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (5) and (7), 382 Mass. 785 (1981).[10] Bar counsel requested that the respondent be suspended from the practice of law for three years, but the committee recommended that respondent receive a public reprimand. The committee's findings and recommended sanction were forwarded to the board, which adopted the committee's findings of fact and conclusions of law; concluded that the respondent had also violated DR 1-102 (A) (5)[11]; and recommended that the respondent be suspended for six months. Two members of the board dissented in favor of harsher discipline (eighteen-month suspension) and two members favored a lesser (unstated) discipline.

---

[8]The agent was called as a witness by bar counsel for the limited purpose of authenticating the tape recordings he made of his conversations with the respondent. The agent's testimony in this regard was authorized by the United States attorney for the district of Massachusetts pursuant to 28 C.F.R. §§ 16.21 et seq. On cross-examination, the agent was instructed by an assistant United States attorney not to answer any questions unrelated to authentication because he was not authorized to testify about anything other than authentication. The United States attorney denied the respondent's subsequent request for authorization to recall the agent for testimony generally concerning the Federal investigation of alleged corruption at the Boston Municipal Court.

[9]Supreme Judicial Court Rule 3:07, Canon 1, DR 1-102 (A) (4) and (6), 382 Mass. 769 (1981), provides, in pertinent part: "A lawyer shall not . . . (4) [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation[; or] (6) [e]ngage in any other conduct that adversely reflects on his fitness to practice law."

[10]Supreme Judicial Court Rule 3:07, Canon 7, DR 7-102 (A) (5) and (7), 382 Mass. 785 (1981), provides, in pertinent part: "In his representation of a client, a lawyer shall not . . . (5) [k]nowingly make a false statement of law or fact[;] (7) [c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

[11]Supreme Judicial Court Rule 3:07, Canon 1, 1-102 (A) (5), 382 Mass. 769 (1982), provides, in pertinent part: "A lawyer shall not . . . [e]ngage in conduct that is prejudicial to the administration of justice."

Bar counsel and the respondent both appealed from the board's recommendation to a single justice of this court, seeking, respectively, a suspension of not less than eighteen months and a public reprimand. The single justice imposed an eighteen-month suspension based on her conclusion that such a sanction was appropriate in relation to sanctions imposed in similar cases. She also concluded that an eighteen-month suspension was warranted in this particular case because the respondent's making false statements to the prosecutor was substantially akin to making false statements to a court. The respondent appealed to the full court, claiming the single justice should have deferred to the board's recommended six-month suspension.

3. *Standard of review.* Our general standard of review when a disciplinary sanction imposed by a single justice is challenged is whether the sanction "is markedly disparate from judgments in comparable cases." *Matter of Finn*, 433 Mass. 418, 422-423 (2001). See *Matter of Kerlinsky*, 428 Mass. 656, 664, cert. denied, 526 U.S. 1160 (1999); *Matter of Tobin*, 417 Mass. 81, 88 (1994); *Matter of Alter*, 389 Mass. 153, 156 (1983). But where the case is unique or involves a matter of first impression and is therefore not comparable to previous cases, we "review the decision of the single justice to determine whether it is supported by sufficient evidence, constitutes an abuse of discretion, and is free from any error of law." *Matter of McInerney*, 389 Mass. 528, 530 (1983). In either instance, our review of the single justice's decision is de novo, but tempered with substantial deference to the board's recommendation. See *Matter of Finn, supra* at 423; *Matter of Tobin, supra.*

Fundamentally, however, "[e]ach case must be decided on its own merits and every offending attorney must receive the disposition most appropriate in the circumstances." *Matter of the Discipline of an Attorney*, 392 Mass. 827, 837 (1984). "The 'primary factor' in bar discipline is 'the effect upon, and perception of, the public and the bar.' " *Matter of Kerlinsky, supra,* quoting *Matter of Finnerty*, 418 Mass. 821, 829 (1994). "We must consider what measure of discipline is necessary to protect the public and deter other attorneys from the same behavior." *Matter of Concemi*, 422 Mass. 326, 329 (1996).

4. *Discussion.* The board's findings of facts, supplemented by

the undisputed evidence set forth in the many tape-recorded conversations between the respondent and the agent, leave no doubt as to the serious nature of the misconduct at issue. What is unusual in this case is our ability to perceive with full clarity the depth of that misconduct and the ready ease with which the respondent engaged in it. The respondent's own words repeatedly reflect complete disregard, if not utter contempt, for the fundamental ethical obligations of an officer of the court.

In assessing what sanction to impose, the single justice considered what she viewed as similar cases, and imposed an eighteen-month suspension that she concluded was "the maximum sanction consistent with our precedent" appropriate to the respondent's serious and deliberate misconduct. She did not defer to the board's recommendation of a six-month suspension because she found it to be based on "unconvincing" findings of mitigating circumstances.

We begin by agreeing that the single justice properly rejected as "mitigating" the circumstances relied on by the board, as well as the board's recommended sanction that was based on those circumstances. In essence, the board found the following circumstances to mitigate the serious misconduct at issue: (1) the agent induced the respondent's misconduct by initially broaching the subject of perjury; (2) the respondent's consideration of using perjured testimony was a brief "flirtation" that he quickly realized was error; (3) the respondent did not actually present the agent's false testimony in court; and (4) the respondent was not able fully to cross-examine the agent at the hearing on his misconduct. For the reasons set forth below, and to the extent they are even supported in the record, none of these circumstances mitigates the respondent's misconduct.

*Inducement.* While the agent initiated the first conversation about the possibility of fabricating a defense ("Well can we think of a way that maybe . . . the gun got in the car?"), the respondent had a duty to reject any suggestion that a defense could be devised and presented through false testimony. There is no evidence that the respondent was pressured into the course of action he recommended, and rather than rejecting the suggestion he embraced it as his own. He developed the false story, advised the agent to seek out and make up details to ensure his

false testimony would appear credible, and passed the fabricated story along to the prosecutor in an effort to influence the outcome of the case. That the agent first raised the subject of fabricated testimony cannot be considered a factor mitigating the respondent's utter failure to reject it.

*Flirtation.* The board's finding that the respondent only "flirted briefly with using perjured testimony . . . but he 'quickly realized his error' " is belied by the clear record in this case. The respondent adopted the strategy of fabricating a defense during his June 11 meeting with the agent; developed it in full detail over the period of one and one-half months; discussed it twice with the prosecutor during this same period of time; met with the agent on July 23 to lay out the false story and to prepare his perjured testimony; advised the agent to visit the location mentioned in the false story so as to identify credible details to embellish it, and to make up the description of one of the false characters in the story; lied to the prosecutor to obtain a continuance of the July 26 trial date when the agent expressed concern about proceeding to trial so soon; and continued to discuss the fabricated defense strategy with the agent through October of that same year. Hardly a brief flirtation, this was a prolonged and close embrace with false testimony. The fact that an additional plausible defense later became apparent and was pursued by the respondent does not mitigate his undisputed misconduct. Nor should the fact that the proceeding ended with a nolle prosequi, making the fabricated defense unnecessary, be mistaken for a change of heart. The apparent, if not unavoidable inference to be drawn from the respondent's ready willingness to fabricate a defense and prepare false testimony to support it is that this was not an aberration from his normal practice, but business as usual.[12] We will not ignore such an inference. *Matter of Orfanello*, 411 Mass. 551, 556-557 (1992).

*False testimony not presented.* Had the case proceeded to trial and the respondent presented the false story he had concocted and the false testimony he had developed (which the

---

[12]The recorded conversations also reflect the respondent's longstanding and easy familiarity with the corrupt practices of the court officer who subsequently pleaded guilty to racketeering.

record suggests he was fully ready to do), the sanction respondent would be facing most assuredly would have been disbarment. See *In re Storment*, 873 S.W.2d 227 (Mo. 1994) (attorney disbarred for encouraging client to testify falsely at trial and presenting false testimony); *Matter of Edson*, 108 N.J. 464 (1987) (attorney disbarred for assisting clients in fabrication of false testimony and presenting false testimony at trial); *Board of Overseers of the Bar* v. *Dineen*, 481 A.2d 499 (Me. 1984) (attorney disbarred for knowingly eliciting false testimony at trial from client). "There is no room in the profession of the law for those who commit deliberate falsehood in court." *Matter of Sleeper*, 251 Mass. 6, 20 (1925) (attorney disbarred for committing perjury). The fact that the false testimony was never presented in court, under oath, surely is a factor to be considered in assessing the seriousness of the misconduct — indeed, it is the very fact by which the respondent avoids disbarment — but it does not mitigate the misconduct that has been proved. Otherwise stated, the respondent's misconduct is not mitigated by his failure to commit a more severe offense. *Matter of Gross*, 435 Mass. 445, 452 (2001).

*Cross-examination.* The board's finding that "[t]he respondent was denied an opportunity to flesh out potential mitigating circumstances" because the agent testified only to authenticate the tape recordings and the respondent's cross-examination was limited to questions of authentication, cannot serve as a mitigating factor in the absence of any showing of how such cross-examination would have developed specific facts properly considered to be in mitigation of the respondent's misconduct. In his offer of proof concerning the cross-examination he wished to conduct, the respondent identified nothing that would have helped his defense or mitigated the offenses proven by the tapes.[13]

Finally, in addition to the mitigating circumstances recognized

---

[13]The respondent parlays the limitation on the agent's testimony into a claimed due process violation. Attorneys in bar discipline proceedings are entitled to due process rights. See *Matter of Eisenhauer*, 426 Mass. 448, 453, cert. denied, 524 U.S. 919 (1998); *Matter of Tobin*, 417 Mass. 92, 101 (1994); *Matter of Kenney*, 399 Mass. 431, 435 (1987). The right to cross-examine witnesses and the right to present evidence in one's defense are essential elements of due process. See G. L. c. 30A, § 11 (3). See also *Matter of Tobin*,

by the board, the respondent argues that any sanction should be mitigated because no "true harm" was done. Insofar as his client was actually an undercover FBI agent rather than an actual criminal, the respondent argues that the matter was not "real." This argument misperceives the harm that the ethical rules are intended to prevent. While it is true that additional harm might accrue in the context of an actual case, the most significant harm arising from the respondent's conduct is its effect on the profession and the public's confidence in its integrity. *Matter of Kerlinsky*, 428 Mass. 656, 664 (1999), quoting *Matter of Finnerty*, 418 Mass. 821, 829 (1994) (" 'primary factor' in bar discipline is 'the effect upon, and perception of, the public and the bar' "). The harm inflicted by the respondent's actions and words was real, damaging, and serious. Undercover investigations, and the fictions they employ, are intended to capture genuine misconduct that might not otherwise be observed, but that nonetheless erodes our public institutions. The respondent's misconduct has now been brought to light, and the method by which that was accomplished does not mitigate the harm done.

We next consider whether the eighteen-month suspension imposed by the single justice was disparate with discipline in other cases. We decline to adopt the conclusion of the single justice that the respondent's summary of the would-be fabricated

417 Mass. 92, 102 (1994). But due process does not countenance a fishing expedition; it is limited to the presentation of relevant evidence and a relevant line of questioning on cross-examination.

In order to show a violation of due process, the respondent must show that he was prejudiced by his limited cross-examination of the agent. See *Commonwealth v. Johnson*, 431 Mass. 535, 538 (2000) (defendant complaining of limitations on cross-examination must make "plausible showing" that questioning would have elicited relevant evidence); *Commonwealth v. Fordham*, 417 Mass. 10, 19-20 (1994) ("defendant must show a reasonable likelihood that, had the cross-examination been permitted to continue without interruption, testimony of more than minimal value to the defendant might have been forthcoming"). The respondent has failed to show that he was prejudiced by his limited cross-examination of the agent. He does not indicate how making the agent available for cross-examination with regard to matters related to more than the authentication of the tapes would have produced any relevant testimony. This is not surprising, given that all of the relevant conversations between the agent and the respondent were tape recorded and introduced in evidence. Once authenticated, the tape recordings speak, literally, for themselves, and any cross-examination of the agent regarding their content would have been superfluous.

defense to the prosecutor as an "officer of our government" was the equivalent of presenting such a defense to a judge in a judicial proceeding. While assistant district attorneys are indeed, like other State or county employees, "officers of our government," as lawyers they hold no special status under the code of conduct applicable to all lawyers. Moreover, the rules governing the relationship between lawyers and judges are different from those that govern the relationship between one lawyer and another.[14] Prosecutors are not judges; their roles and responsibilities in our system of justice are very different. Our rejection of the single justice's notion of equivalence does not, however, affect our view of the seriousness of the respondent's misconduct. That view would be the same no matter who the opposing counsel happened to be, and whether the case was criminal or civil.

In determining that a suspension of eighteen months was appropriate and not disparate, the single justice examined and referenced three disciplinary cases involving what she perceived to be comparable types and degrees of misconduct: *Matter of Gross*, 435 Mass. 445 (2001) (eighteen-month suspension for soliciting client and alibi witness to engage in impersonation scheme before court); *Matter of McCarthy*, 416 Mass. 423 (1993) (one-year suspension for eliciting false testimony and presenting false documents in proceeding before rent control board); and *Matter of Neitlich*, 413 Mass. 416 (1992) (one-year suspension for actively misrepresenting terms of real estate transaction in divorce proceeding). In the context of these cases, the imposition of an eighteen-month suspension for the respondent's misconduct was clearly warranted. But we do not view the misconduct in these three cases to be comparable to the insidious nature of what has been laid bare in the present case.

The misconduct in both *Matter of McCarthy, supra*, and *Matter of Gross, supra*, while serious, lacked the depth and heft of

[14]Rule 3.3 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1383 (1998), entitled "Candor Toward the Tribunal," addresses a lawyer's ethical obligations when making representations to a tribunal. A lawyer's ethical obligations vis-à-vis opposing counsel are embodied in Mass. R. Prof. C. 3.4, 426 Mass. 1389 (1998), entitled "Fairness to Opposing Party and Counsel."

the respondent's conduct. Both cases concern the actions of lawyers in the heat of proceedings and without the planning, the premeditation, and the level of manipulation present in the respondent's conduct. Their conduct can fairly be categorized as serious errors of judgment, rather than calculated corruption. The respondent's conduct is the latter. In *Matter of Neitlich, supra,* counsel's misrepresentation of a real estate transaction in the context of a postdivorce proceeding and his repeated failure to produce all of the documentation related to the transaction, while reflecting a measure of premeditation and deliberateness beyond that present in *Matter of Gross, supra,* and *Matter of McCarthy, supra,* remains, however, different in kind from the respondent's affirmative fabrication of a defense and the solicitation of false testimony to support it. In addition, there is no indication that counsel engaged his client in misconduct to nearly the extent the respondent did here. Moreover, not present in any of these three matters is the sense that this was the way in which counsel regularly conducted their practice of law.

In reviewing disciplinary cases previously decided by this court, we have found none of this type, short of those in which the sanction of disbarment was imposed, that is comparable. We therefore must establish independently a sanction adequate to address the seriousness of the misconduct, to reassure the bar and the public that such conduct is completely contrary to the oath of office taken by every lawyer, and to underscore that, when it is uncovered, such conduct will be treated with the utmost severity. In our view, that sanction is a three-year suspension.

*Conclusion.* We vacate the order of the single justice imposing an eighteen-month suspension and remand this matter for entry of a judgment suspending the respondent for a period of three years.

*So ordered.*