## IN THE MATTER OF DANIEL W. GOLDSTONE.

Suffolk. October 3, 2005. - December 16, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Attorney at Law,* Disbarment, Disciplinary proceeding. *Collateral Estoppel. Due Process of Law,* Notice.

In a bar discipline proceeding, the application of offensive issue preclusion against the subject attorney (attorney) as to certain facts that had been thoroughly litigated in a Federal court action was fair, where the board of bar overseers was not involved in the initial civil litigation and had no reason or opportunity to join the proceedings; where the attorney had every incentive to defend the first action vigorously; where the judgment relied upon by bar counsel was not inconsistent with any previous judgments in favor of the attorney; where the bar discipline hearing would not afford the attorney additional procedural opportunities unavailable in the first action; and where the attorney raised no other argument that detracted from the fairness of the proceedings. [558-564]

This court concluded that there was no merit to due process arguments raised by an attorney who was the subject of a bar discipline proceeding, where the hearing committee of the board of bar overseers, which heard the matter concerning the attorney, did not make findings that depended on evidence regarding certain issues that were subject to a preclusion order, and where, to the extent the committee could be said to have made findings regarding an issue that the attorney was precluded from litigating, the attorney was not prejudiced by those findings. [564-565]

Disbarment was the appropriate sanction in a bar discipline case where the board of bar overseers found that, inter alia, the attorney intentionally overbilled and collected from his client hundreds of thousands of dollars in fees and costs to which he was not entitled, on both closed and active cases. [566-567]

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on January 26, 2005.

The case was reported by *Spina,* J.

*David G. Hanrahan* for the respondant.

*Dorothy Anderson,* Assistant Bar Counsel.

CORDY, J. An information and record of proceedings was filed in the Supreme Judicial Court for Suffolk County with the

recommendation of the Board of Bar Overseers (board) that Daniel W. Goldstone be disbarred. The basis of the board's recommendation was its finding, inter alia, that Goldstone intentionally overbilled and collected hundreds of thousands of dollars in fees and costs to which he was not entitled, thereby converting and misappropriating client funds. A single justice reserved and reported the case to the full court. We conclude that disbarment is warranted.

1. *Prior proceedings.* Bar counsel commenced proceedings against Goldstone by filing a petition for discipline on January 31, 2002, alleging that Goldstone billed Sears, Roebuck and Co. (Sears) for costs and attorney's fees without any substantial basis for believing that Sears owed the amounts billed, wrongfully withheld funds due to Sears and used such funds to defray expenses for which he was responsible, and threatened Sears that he would not remit funds he was collecting on its behalf on active accounts if Sears did not make payments on his bills for closed accounts. Along with the petition, bar counsel filed a motion to preclude Goldstone from contesting the factual allegations in the petition, based on the resolution of those facts in a civil action brought by Sears against Goldstone in Federal court, arising out of the same disputed billing. The Federal action was for breach of contract, breach of fiduciary duty, and violation of G. L. c. 93A. A Federal District Court judge entered summary judgment for Sears in the matter, and the judgment was affirmed on appeal. *Sears, Roebuck & Co.* v. *Goldstone & Sudalter, P.C.*, 128 F.3d 10 (1st Cir. 1997) (*Sears, Roebuck*).

In May, 2002, the board's chair allowed bar counsel's motion to preclude in part, concluding that certain facts had been thoroughly litigated in the prior proceeding and could not be litigated again.[1] Factual issues concerning commingling of cli-

---

[1] Specifically, the chair concluded: "Respondent has offered nothing to impugn the validity of the finding that he billed his client for court costs and hourly fees on contingent fee cases closed before he purchased the practice, the finding that he billed his client for expenses on active cases when those expenses were included in the 45% contingent fee, or the finding that he threatened to withhold collected funds in order to force settlement of disputed bills. Respondent had every opportunity to litigate those issues, which were determined against him."

ent and personal funds and Goldstone's "state of mind" (which were not litigated in the Federal proceeding), however, could still be disputed at the disciplinary hearing. Goldstone unsuccessfully sought interlocutory relief in the county court concerning the preclusion ruling, and then filed his answer with the board on November 7, 2002.

A hearing committee (committee) of the board held an evidentiary hearing on April 10 and 11, 2003, and on December 16, 2003, filed its report and its recommendation that Goldstone be disbarred from the practice of law. Goldstone appealed from the report claiming that the committee erroneously gave preclusive effect to certain facts litigated in the civil suit in Federal court and that three of the committee's findings were arbitrary and capricious and unsupported by substantial evidence.[2] On January 10, 2005, following a review of the record, the board adopted the committee's findings and unanimously voted to recommend that Goldstone be disbarred from the practice of law.

Goldstone appeals from the board's findings and recommendation of disbarment, arguing that the offensive use of issue preclusion was unfair and that his due process rights were violated because the committee's conclusions (adopted by the board) were based on findings that went beyond the scope of what he had been told would be litigated at the hearing.

2. *Facts.* The following facts are drawn from the undisputed facts of record in the Federal proceedings and the committee's findings that were adopted by the board.

In 1991, Goldstone commenced negotiations with Janice Sudalter to purchase the law practice of her late husband, Eldon Sudalter (Sudalter). For this purpose, Goldstone formed Goldstone & Sudalter, P.C. By early 1992, Goldstone had taken over Sudalter's firm, although the sale was not consummated until early 1993. Sudalter's practice had specialized in debt collec-

---

[2]The disputed findings were that (1) the respondent was unreasonable in billing Sears for costs and fees on "inactive" or "closed" files without making adequate inquiry whether those amounts had already been paid to predecessor counsel; (2) the respondent intentionally violated the terms of the 1987 fee agreement with Sears by withholding costs from collected awards; and (3) the respondent's threats of "self-help" constituted violations of the Canons of Ethics and Disciplinary Rules.

tion, and he had been the primary collection attorney for Sears in eastern Massachusetts for the previous fifteen years. Mrs. Sudalter had worked in her husband's office for most of that time, and her regular duties included preparing the monthly billings for Sears and other clients. As with most collection attorneys, Sudalter had operated on a contingency fee basis. Before 1987, Sears paid him one-third of his recovery and reimbursed him for all court costs. This changed in 1987 when Sudalter executed an "Attorney Retention Agreement" prepared by Sears (1987 agreement).

The 1987 agreement increased the contingency fee to forty-five per cent, but the collection attorney was now responsible for all costs that were not reimbursed by debtors. According to Mrs. Sudalter, under the new agreement, "[W]e take 45 percent of what we collect. If we can recover the costs [from debtors], great. If we can't recover the costs, that's just part of the agreement; that's why they're [Sears] paying us the 45 percent." According to the 1987 agreement, the collection attorney was to send all monies collected to Sears on a monthly basis, and Sears would then pay the attorney's forty-five per cent contingency fee.[3] The 1987 agreement set forth a separate compensation agreement if Sears terminated the agreement or withdrew customer accounts from the collection process. In that event, Sears would pay Sudalter sixty dollars per hour for work he had done on the account and reimburse any court costs, although it would pay no such fees if the attorney terminated the agreement or was in breach of the agreement. Goldstone reviewed the 1987 agreement before he bought the practice, and he understood that he was bound by the terms of that agreement when he assumed ownership of the firm.

When Goldstone took over the practice, he had no personal knowledge of whether particular collection cases in Sudalter's files had been billed or were uncollectible, or had been formally closed, whether or not billed or uncollectible. He had never

---

[3]The 1987 agreement provided: "Attorney will be accountable for all monies collected on any of the accounts and will submit at least monthly a report to Sears listing the accounts on which collections were made and amount collected, together with a check payable to Sears for all monies collected." The agreement also stated: "Attorney waives any attorney's lien on Sears accounts and agrees not to assert such lien against Sears."

worked with Sudalter, nor had he ever discussed with him the firm's billing practices. In addition, the committee found that Goldstone did not ask Mrs. Sudalter about the billing and collection practices for pre-1987 files, but rather relied on Frederick Casson, who had worked for Sudalter on an as-needed basis, and Karen D'Angelo, a "low-level" Sears employee. Their cumulative knowledge of the firm's prior practices in billing Sears was far more limited than Mrs. Sudalter's.

Mrs. Sudalter's testimony regarding the procedures and practices for closing files at the Sudalter firm was as follows. Files were closed when (1) payment in full was received; (2) the debtor filed for bankruptcy protection; or (3) the debtor was judgment-proof. When one of these contingencies occurred, Mrs. Sudalter would stick a "red dot" on the outside of the file, and box and store the closed files in the file room. She did not notify Sears when files were closed, and the law practice never intended to submit any further bills to Sears on "closed" cases. Both Goldstone and Casson testified that they understood a red dot on the file meant it was inactive or the debt was uncollectible.

The conduct that gave rise to the petition for discipline began when Goldstone noticed that Sears was sending fewer cases to the firm than it had in the past. Goldstone contacted D'Angelo, who explained that it was due to the firm's low collection ratio since Sudalter had "never closed a file in fifteen years." D'Angelo then encouraged Goldstone to close more files. Goldstone subsequently spoke to Emma Scott, in-house counsel for Sears, who also told him to close Sudalter's files. Goldstone did not tell either of the Sears employees about the volume of files (thousands) that were in storage, or about the manner in which he intended to calculate the fees and costs that he intended to bill in "closing" those files.

Following his conversation with D'Angelo, Goldstone instructed Casson to review all of the Sears files to determine which ones were inactive or uncollectible and then, with respect to those files, to determine what costs the firm had expended that had not been reimbursed by Sears or anyone else. Casson testified, and the committee credited his testimony, that he relied almost exclusively on notations appearing on the outside

of the folders for his information, and that he noted the amount of costs he believed were still owed the firm on the front of the file in black "magic marker."

In early 1992, Goldstone also began reviewing the thousands of files contained in "dead storage" in the basement, most of which had red dots on them, indicating that they were "closed" and fully paid. The committee refused to credit his testimony that he went through every file personally before billing Sears for costs or fees owed, but it did credit his testimony that he did not consider a file closed until it was closed and billed by him (notwithstanding his understanding that files marked with red dots were already closed). Goldstone derived his cost figures from the handwritten notations on the outside of the folders. If no record of any payment from Sears was reflected on the folder itself, he assumed that the costs had not been paid.[4] He then proceeded to bill Sears for costs on those files. He calculated attorney's fees due on those files by estimating the amount of time Sudalter had spent on each case at sixty dollars per hour.

Between early 1992 and February, 1994, Goldstone billed Sears for $1.1 million in unpaid attorney's fees and costs related to his "closing" 15,000 of Sudalter's old files. Over this period of time, Sears paid Goldstone in excess of $833,000. Sears began to question the amounts billed when they exceeded the amounts Goldstone collected on its behalf during the same time frame. Goldstone represented that Sears had not previously paid for these cases. When Sears again questioned the bills, Goldstone threatened to deduct his fees from money collected for current Sears accounts. In addition, he noted in a letter that he and the firm felt "restrained from acting in our client's best interest because of" Sears's failure to pay. The committee found that, even if Goldstone did not have actual knowledge that the billings he sent Sears were false and that he was not entitled to the fees and costs claimed, he consciously avoided obtaining readily available information that would have put him on actual notice, and thus his actions constituted wilful blindness and intentional misconduct.

During this same time, Goldstone (as required by the 1987

---

[4]The committee found that this assumption was contradicted by evidence in the files introduced at the hearing.

agreement) remitted to Sears on a monthly basis the money he collected for it on active files, and Sears paid him the forty-five per cent contingency fee. Without Sears's knowledge, however, Goldstone deducted costs he had incurred from the monies he collected before sending the balance to Sears each month, in direct violation of the 1987 agreement.

In 1994, Sears terminated the relationship with Goldstone and commenced an action for an accounting in the Federal District Court. Sears subsequently amended its complaint to include claims for breach of contract, breach of fiduciary duty, and violations of G. L. c. 93A. Goldstone counterclaimed for the unpaid balance of his bills. A District Court judge entered summary judgment for Sears in the amount of $833,409 plus interest and attorney's fees in the amount of $112,000. The judgment was affirmed in October, 1997. Goldstone made no payment to Sears on the judgment until July 29, 2002, six months after bar counsel filed the petition for discipline, at which time he paid only $89,256.06. No other payment on the judgment was made.

Based on the foregoing, the committee concluded that Goldstone's conduct in submitting bills to Sears violated S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), as appearing in 382 Mass. 769 (1981) (attorney shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (6), as appearing in 382 Mass. 769 (1981) (attorney shall not engage in any other conduct that adversely reflects on his fitness to practice law); S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (1), as appearing in 382 Mass. 784 (1981) (intentional failure to seek lawful objectives of client); S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (2), as appearing in 382 Mass. 784 (1981) (intentional failure to carry out contract of employment); and S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (3), as appearing in 382 Mass. 784 (1981) (prejudice or damage to client), because he failed to take steps to determine whether costs had been billed previously and paid by Sears on the closed files and he was unreasonable in failing adequately to inquire of other Sudalter employees, particularly Mrs. Sudalter, and of Sears, to ascertain the extent to which costs and fees were due from Sears on certain "inactive" files. In addition, the commit-

tee concluded that Goldstone violated S.J.C. Rule 3:07, Canon 2, DR 2-106 (A) and (B), as appearing in 382 Mass. 772 (1981) (attorney cannot charge or collect a clearly excessive fee), by charging and collecting a clearly excessive fee because he was unreasonable in failing to discuss with the client the method he intended to use in calculating outstanding costs and fees on closed files, as well as the volume of files that would be the subject of further billing.

The committee also found that Goldstone's conduct violated DR 7-101 (A) (2); DR 7-101 (A) (3); and S.J.C. Rule 3:07, Canon 9, DR 9-102 (B), as appearing in 419 Mass. 1303 (1995) (attorney shall preserve identity of funds and property of client), when, knowing of the terms of the 1987 agreement, he intentionally retained some of the collected funds that belonged to the client as reimbursement for court costs, in derogation of the 1987 agreement. The committee further found that Goldstone's wrongful and intentional withholding of these funds and his use of them to defray costs for which he, and not the client, was responsible also violated DR 1-102 (A) (4); DR 1-102 (A) (6); DR 7-101 (A) (1); DR 7-101 (A) (2); DR 7-101 (A) (3); and S.J.C. Rule 3:07, Canon 9, DR 9-102 (A), (B), as appearing in 419 Mass. 1303 (1995); and DR 9-102 (C), as amended, 419 Mass. 1306 (1995) (preserving identity of client funds and property).

Finally, the committee found that Goldstone violated DR 1-102 (A) (6), DR 2-106 (A) and (B), and DR 7-101 (A) (3) when he sent a letter to Sears in which he threatened that he would deduct amounts billed, and allegedly not yet paid by Sears on the closed files, from the funds that he was collecting on behalf of Sears on the active accounts.

3. *Issue preclusion.* The offensive use of issue preclusion is appropriate in bar disciplinary proceedings. *Matter of Cohen*, 435 Mass. 7, 15 (2001). *Bar Counsel* v. *Bar Overseers*, 420 Mass. 6, 10-11 (1995) (relitigation "would not comport with the judicial goals of finality, efficiency, consistency, and fairness").[5] For issue preclusion to apply, there must be "an identity of issues, a finding adverse to the party against whom it

---

[5]Offensive issue preclusion "occurs when a plaintiff seeks to prevent a defendant from litigating issues which the defendant has previously litigated

is being asserted, and a judgment by a court or tribunal of competent jurisdiction." *Matter of Cohen, supra,* quoting *Miles* v. *Aetna Cas. & Sur. Co.,* 412 Mass. 424, 427 (1992). Summary judgment decisions are entitled to preclusive effect where the parties were fully heard, the court's decision is supported by a reasoned opinion, and the opinion was subject to review or was in fact reviewed. *Jarosz* v. *Palmer,* 436 Mass. 526, 533-534 (2002), quoting *Tausevich* v. *Board of Appeals of Stoughton,* 402 Mass. 146, 148-149 (1988).

A defendant must also have a "full and fair opportunity to litigate the issue in the first action." *Matter of Cohen, supra,* quoting Restatement (Second) of Judgments § 29 (1982). See *Fireside Motors, Inc.* v. *Nissan Motor Corp. in U.S.A.,* 395 Mass. 366, 373 (1985), quoting *Fidler* v. *E.M. Parker Co.,* 394 Mass. 534, 541 (1985). Fairness is the "decisive consideration" in determining whether to apply offensive issue preclusion. *Matter of Cohen, supra* at 16, quoting *Aetna Cas. & Sur. Co.* v. *Niziolek,* 395 Mass. 737, 745 (1985). In making this determination, "courts generally ask whether (1) the party in whose favor the [preclusion] would operate could have joined the original action, (2) the party against whom it would operate had an adequate incentive to defend the original action vigorously, (3) 'the judgment relied upon as a basis for the [preclusion] is itself inconsistent with one or more previous judgments in favor of the defendant,' and (4) 'the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.' " *Haran* v. *Board of Registration in Med.,* 398 Mass. 571, 577-578 (1986), quoting *Parklane Hosiery Co.* v. *Shore,* 439 U.S. 322, 329-331 (1979).

The application of offensive issue preclusion was fair in this case. First, the board was not involved in the initial civil litigation because it had neither a reason, nor an opportunity, to join the proceedings. Second, Goldstone had every incentive to defend the first action vigorously because he was confronting severe financial consequences if Sears's allegations were found

unsuccessfully in an action against another party." *Matter of Cohen,* 435 Mass. 7, 15 (2001), quoting *Bar Counsel* v. *Bar Overseers,* 420 Mass. 6, 9 (1995). Issue preclusion applies to issues of law or fact. See Restatement (Second) of Judgments § 27 (1982).

to be true. Sears had alleged fraud, breach of contract, breach of fiduciary duty, and violation of G. L. c. 93A, seeking not only repayment of all fees that had been paid on the closed cases (more than $833,000), but also multiple damages under G. L. c. 93A. In addition, Goldstone had counterclaimed for the unpaid balance of his bills. As such, the amount in dispute in that action was in excess of $2 million, and Goldstone had an obvious incentive to defend that action vigorously. Third, the judgment relied on by bar counsel is not inconsistent with any previous judgments in favor of Goldstone — the civil case is the only relevant judgment here. Finally, contrary to Goldstone's contention, the bar discipline hearing would not afford him additional procedural opportunities unavailable in the first action that could "readily cause a different result."

Goldstone argues that, had an affidavit by Casson been admitted in the Federal action,[6] the court could not have found that Mrs. Sudalter was the only person with the requisite firsthand knowledge of the firm's billing procedures (and therefore should have been consulted by Goldstone). Consequently, according to Goldstone, a dispute as to a material fact would have existed, summary judgment would not have been entered, and offensive issue preclusion would not have been available in the bar discipline hearing. However, issue preclusion is premised on a party's prior opportunity to litigate an issue, not on whether the party made the best use of that opportunity. With hindsight, every litigant who loses a case can point to some additional step that he or she could have taken, and can contend that that step would have made a difference in the outcome. Merely pointing to such steps (here, the step of properly identifying Casson during discovery and submitting his affidavit in opposition to the summary judgment motion) does not operate to avoid issue preclusion. Goldstone had the "opportunity" to submit the Casson affidavit in the prior proceedings, as long as he abided by the procedural requirements for submitting it (i.e., by making

---

[6]The affidavit in question was excluded by the District Court judge because Goldstone failed to disclose Frederick Casson's identity pursuant to Fed. R. Civ. P. 26(a) at the outset of the litigation. The United States Court of Appeals for the First Circuit concluded that the decision to exclude the affidavit was well within the judge's discretion. *Sears, Roebuck & Co.* v. *Goldstone & Sudalter, P.C.*, 128 F.3d 10, 18 n.7 (1st Cir. 1997).

proper disclosure in discovery). His own failure to comply with the rules applicable to the Federal proceedings does not mean that he was deprived of a fair opportunity to litigate.

Moreover, it is not likely that the inclusion of Casson's affidavit "in the first action" (which only dealt with the calculation of "costs" from old files) would have created a genuine dispute of material fact.[7] First, although the District Court judge ultimately struck Casson's affidavit because of a violation of Fed. R. Civ. P. 26 (see note 6, *supra*), he nevertheless reviewed and addressed it in his summary judgment decision. In doing so, he noted that "nowhere in Casson's affidavit, whatever was the practice he encountered in 1986, does he dispute Mrs. Sudalter's testimony that files emblazoned with red stickers were closed and fully paid up."

Second, the affidavit has absolutely no bearing on the issue of attorney's fees. The following facts were not disputed in the civil case:

> "From February 1, 1992 until February 23, 1996, Goldstone billed Sears for costs and attorney's fees on each of over 15,000 files . . . . He derived his figures for attorney's fees by estimating the amount of time that Sudalter had spent on each file by examining the tasks that the file reflected had been performed, or by having nonattorney employees perform such estimates to his specifications.
>
> ". . .
>
> "The evidence [Goldstone] presented to substantiate the bills he submitted for over 15,000 files consists entirely of . . . his own estimates of the amount of time that Sudalter spent on cases stretching over fifteen years."

*Sears, Roebuck, supra* at 13-14, 18.[8]

Third, as to whether the admission of the Casson affidavit

---

[7]See Restatement (Second) of Judgments § 29(2) (1982) (judge should consider whether "forum in the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issue that were not available in the first action and *could likely result* in the issue being differently determined" [emphasis added]).

[8]Indeed, Casson testified before the committee that he played no role in

would have affected the findings concerning Goldstone's bills to Sears for costs on the old files, it is undisputed that Goldstone "derived his cost figures from the handwritten notations on the outside of the folders. He assumed that Sudalter had not been reimbursed by Sears or debtors unless there was a handwritten note to that effect on the folder." *Sears, Roebuck, supra* at 13. Casson's affidavit does not address Goldstone's methodology in computing bills.

Goldstone contends, however, that had the Federal court considered the Casson affidavit, it would not have been able to conclude that his bills to Sears were baseless because Casson confirmed the accuracy of Goldstone's own assumptions about the annotations on the file covers with respect to costs. But even if Casson had been competent to testify about Sudalter's billing practices, that information would only be relevant if Casson had shared it with Goldstone, who had in turn relied on it. Casson did not claim in his affidavit that he had told Goldstone about Sudalter's practices, and Goldstone did not attest in his own affidavit — submitted exclusively for the purpose of defeating summary judgment — that Casson was the source of his assumptions about the file cover notations. If there was no evidence in the Federal proceeding that Casson shared the information with Goldstone or that Goldstone relied on it, Casson's understanding of the meaning of notations on the Sears file covers would have been irrelevant to determining whether Goldstone had a good faith basis for making the assumptions about the notations on which he based his bills.

Finally, the Casson affidavit has no bearing on the conclusion that Goldstone improperly skimmed his costs from funds owed to Sears. The facts recited in the light most favorable to Goldstone included that:

> "During this time, Goldstone also submitted monthly the money he had collected for Sears on active files, and Sears paid the forty-five percent contingency fee. Despite the 1987 Agreement, and without Sears's knowledge, Goldstone also pocketed a portion of the money he col-

estimating attorney's fees charged to Sears, and Goldstone states in his brief that Casson never intended to suggest in his affidavit that he had taken any part in the estimation of attorney's fees.

lected from Sears debtors as reimbursement for court costs before sending the balance to Sears each month."

*Sears, Roebuck, supra* at 12, 14. This "skimming" was critical to the determination that Goldstone had violated G. L. c. 93A:

> "Goldstone admitted to conduct which constitutes unethical behavior in skimming his costs off the top of Sears collections without Sears's knowledge or consent and in violation of his contract. See DR 9-102. Violations of the rules governing the legal profession are evidence of legal malpractice, and are also relevant in Chapter 93A determinations."

*Id.* at 19, and cases cited.

In sum, the admission of the Casson affidavit in the Federal proceeding would not have created a dispute about Goldstone's practice of skimming on active files, it would not have created a dispute whether Goldstone's bills for attorney's fees were based entirely on his estimation of how much work had been done on a file, and it would not have created a dispute whether Goldstone in good faith relied on Casson's representations concerning Sudalter's billing for costs. Finally, as the District Court judge recognized, the admission of the Casson affidavit would not have created any dispute about the fact that Goldstone billed Sears on thousands of files that were already marked as closed.

In any event, Casson testified at the bar discipline hearing and the committee reviewed his affidavit. Although the committee credited Casson's testimony that he relied almost exclusively on notations appearing on the outside of the folders when he was calculating whether costs were still owed to the firm, it did not credit his affidavit because it was inconsistent with his testimony at the hearing. As such, the inclusion of the Casson affidavit in the bar discipline hearing did not readily cause a different result from the first action.

Goldstone also claims that the use of issue preclusion was improper because the allocation of the burden of proof was different in the two proceedings. However, the preclusion order was limited to certain undisputed facts recited by the Federal

court, and where it was Sears's motion for summary judgment, the facts were stated in the light most favorable to Goldstone. *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), citing Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). The burden of proof came into play only when the Federal court applied the law to those undisputed facts. See *Ragen Corp.* v. *Kearney & Trecker Corp.*, 912 F.2d 619, 625-626 (3d Cir. 1990), quoting *Lindevig* v. *Dairy Equip. Co.*, 150 Wis. 2d 731, 735 (Ct. App. 1989) ("Whether a party has sustained its burden of proof is a question of law . . ."). The limited preclusion order did not include any of the Federal court's legal rulings because it was the committee's responsibility to determine whether the undisputed facts constituted violations of the Canons of Ethics and Disciplinary Rules. Therefore, allocation of the burden of proof was irrelevant to whether the limited preclusion order was appropriate.

4. *Due process.* It is well settled that attorneys facing bar discipline proceedings are entitled to due process. *Matter of Abbott*, 437 Mass. 384, 391 (2002), citing *In re Ruffalo*, 390 U.S. 544, 550 (1968). Among these protections are the right to fair notice of the charges and the right to be heard. *Matter of Eisenhauer*, 426 Mass. 448, 453-454, cert. denied, 524 U.S. 919 (1998).

Goldstone argues that the committee's findings depended on evidence regarding issues that were subject to the preclusion order. Specifically, he claims that the committee made findings as to the accuracy of the billing and as to Sears's "state of mind," issues that he was precluded from litigating. As a result, he claims he was deprived of "fair notice of the charges and an opportunity for explanation and defense." *Matter of Tobin*, 417 Mass. 92, 101 (1994). We disagree.

The preclusion order stated that the committee would hear evidence as to Goldstone's "state of mind" and the issue of commingling of funds. Goldstone argues that the committee accepted evidence as to the accuracy of the billing, which he was precluded from contesting. However, the committee's review of a sample of Goldstone's files, and its acceptance of testimony about the firm's billing practices, pertained to an issue Goldstone was permitted to litigate, and which bears directly on his

"state of mind": whether he had a good faith belief that he was owed money by Sears. In any event, Goldstone did not object to the admission of the sample files in evidence and thus cannot now claim that he was surprised or prejudiced by the committee's review of them.

Similarly, Goldstone argues that the committee made findings regarding Sears's "state of mind" that Goldstone was precluded from litigating. The only finding arguably pertaining to Sears's "state of mind" was that:

> "[W]e do not believe and do not find that Ms. D'Angelo or any other Sears employee was ever informed by the Respondent of the sheer numbers of Sears files in Attorney Sudalter's office, or that there was any discussion between counsel and client on how the Respondent derived and calculated his fees and costs when closing the Sears files, and whether this was acceptable to Sears."

First, this is not a conclusion about the "state of mind" of Sears. It is a conclusion about Goldstone's communications with Sears. Second, the committee based this conclusion on Goldstone's own testimony. He testified that a Sears employee (D'Angelo) told him to close cases and to charge Sears for his fees and costs, and at the time of that conversation, he did not know how many Sears files he had, much less how many he might close. Third, Goldstone cannot credibly contend that he did not call Sears employees as witnesses because he believed such testimony would be excluded. If any Sears employee could have testified about a conversation he or she had with Goldstone about his billings, such conversation was certainly relevant to Goldstone's "state of mind." It is not credible that Goldstone's failure to call any witness from Sears was due to his misapprehension that such testimony would have been excluded.

Thus, to the extent that the committee made findings that did not purely concern Goldstone's "state of mind," he was not prejudiced by those findings. The committee considered evidence that was offered by the parties, almost entirely without objection. All of its findings were based on the evidence before it, were relevant to the issues in the case, and were entirely predictable.

5. *Disposition.* Ultimately, "[e]ach case must be decided on its own merits and every offending attorney must receive the disposition most appropriate in the circumstances." *Matter of Foley*, 439 Mass. 324, 333 (2003), quoting *Matter of the Discipline of an Attorney*, 392 Mass. 827, 837 (1984) (*Three Attorneys*). "The 'primary factor' in bar discipline is 'the effect upon, and perception of, the public and the bar.'" *Matter of Kerlinsky*, 428 Mass. 656, 664 (1999), quoting *Matter of Finnerty*, 418 Mass. 821, 829 (1994). "We must consider what measure of discipline is necessary to protect the public and deter other attorneys from the same behavior." *Matter of Foley*, *supra*, quoting *Matter of Concemi*, 422 Mass. 326, 329 (1996).

In this case, disbarment is the appropriate sanction. See *Matter of Schoepfer*, 426 Mass. 183, 187 (1997), citing *Three Attorneys*, *supra* at 836 (if "an attorney intended to deprive the client of funds, permanently or temporarily, or if the client was deprived of funds [no matter what the attorney intended], the standard discipline is disbarment or indefinite suspension"); *Matter of Bryan*, 411 Mass. 288, 292 (1991) ("absence of restitution is a factor in choosing between disbarment and indefinite suspension"). See also *Matter of Tobin*, 417 Mass. 81, 88 (1994), quoting *Matter of Palmer*, 413 Mass. 33, 38 (1992) (we consider "the cumulative effect of the several violations committed by the respondent").

Here, the board found that Goldstone intentionally overbilled and collected from his client hundreds of thousands of dollars in fees and costs to which he was not entitled, on both closed and active cases. Where an attorney lacks a good faith belief that he has earned and is entitled to the monies, such conduct constitutes conversion and misappropriation of client funds. In addition, Goldstone intentionally and secretly withheld money from the client in violation of the 1987 agreement, and used those funds to pay costs that were his responsibility. When the client questioned the billings, Goldstone threatened to retain more funds to which he was not entitled unless Sears paid. Finally, Goldstone made no restitution to Sears on the judgment until July 29, 2002, six months after bar counsel filed the petition for discipline, and even then only paid a fraction of what he owed. *Matter of Bryan*, *supra*.

Consequently, we adopt the recommendation of the board and remand to the county court where a judgment of disbarment shall enter.

*So ordered.*