## IN THE MATTER OF LOUIS KERLINSKY.

Suffolk. November 5, 1998. - January 14, 1999.

Present: WILKINS, C.J., ABRAMS, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Attorney at Law,* Disciplinary proceeding, Suspension. *Board of Bar Overseers.*

Evidence at a hearing on bar discipline was sufficient for the Board of Bar Overseers properly to conclude that the respondent attorney had violated several provisions of Canons 1, 6, and 7, S.J.C. Rule 3:07, as appearing in 382 Mass. 768 (1981). [662]

An appeal panel of the Board of Bar Overseers was authorized under S.J.C. Rule 4:01, § 8 (3), as appearing in 381 Mass. 784 (1980), to reverse the hearing committee's finding that an attorney had not violated Canon 1, S.J.C. Rule 3:07, as appearing in 382 Mass. 769 (1981); and the hearing committee's initial and supplemental findings supported the appeal panel's conclusion. [662-664]

Three years' suspension from the practice of law was the appropriate discipline for an attorney who, after having been publicly censured previously, engaged in a persistent and extended pattern of improper and unethical behavior that included neglecting a client's case, prosecuting a frivolous claim, and filing false and misleading affidavits and interrogatory answers. [664-666]

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on September 2, 1997.

The case was heard by *Lynch,* J.

*Louis Kerlinsky,* pro se.

*Nancy E. Kaufman,* Assistant Bar Counsel.

MARSHALL, J. This bar discipline case concerns the conduct of Louis Kerlinsky (respondent) in representing Diane Kourouva-cilis in a damage suit against General Motors Corporation (GM) and Avis Rent-A-Car (Avis) following an automobile fire. The respondent makes numerous challenges to the two-year suspension recommended by the Board of Bar Overseers (board) and imposed by the single justice. We limit our discussion to his claims regarding the sufficiency of the evidence on which the board concluded he had violated several provisions of the Canons of Ethics, the authority of the appeal panel of the board

to amend the decision of the hearing committee, and the appropriate discipline to impose.

Bar counsel filed a petition for discipline against the respondent on May 23, 1994, alleging violations of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), (5), and (6), as appearing in 382 Mass. 769 (1981); Canon 6, DR 6-101 (A) (3), as appearing in 382 Mass. 783 (1981); Canon 7, DR 7-101 (A) (1), (2), and (3), as appearing in 382 Mass. 784 (1981); and DR 7-102 (A) (2), (5), and (7), and (B) (1), as appearing in 382 Mass. 785 (1981).[1] Between October, 1994, and March, 1995, a hearing

---

[1]New Massachusetts Rules of Professional Conduct became effective on January 1, 1998, replacing the former Canons of Ethics and Disciplinary Rules. S.J.C. Rule 3:07, as appearing in 426 Mass. 1303 (1998) (Massachusetts Rules of Professional Conduct). The relevant parts of the former Canons and Disciplinary Rules in effect at the time of·the respondent's challenged conduct state:

"DR 1-102. Misconduct.

"(A) A lawyer shall not: . . .

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

"DR 6-101. Failing to Act Competently.

"(A) A lawyer shall not: . . .

"(3) Neglect a legal matter entrusted to him."

"DR 7-101. Representing a Client Zealously.

"(A) A lawyer shall not intentionally:

"(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7-101 (B). A lawyer does not violate this Disciplinary Rules, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

"(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under

committee of the board conducted six days of hearings at which two witnesses testified and 167 exhibits were introduced in evidence. Bar counsel recommended a three-year suspension. On December 11, 1995, the hearing committee issued its report recommending a one-year suspension with readmission "only upon application and the satisfactory completion of an ethics examination." The hearing committee concluded that the respondent had violated DR 6-101 (A) (3), DR 7-101 (A) (1), (2), and (3), DR 7-102 (A) (2) and (7), and DR 7-102 (B) (1), and that the respondent had not violated any of the provisions of Canon 1. Both parties took an appeal from the hearing committee's report.

On July 30, 1996, an appeal panel of the board remanded the case to the hearing committee for clarification of its findings and rulings. The appeal panel sought information regarding whether the respondent's violation of DR 7-101 (A) (1), (2), and (3) was intentional, whether his violation of DR 7-102 (A) (2) and (7) was done knowingly, and whether the respondent had knowingly violated DR 7-102 (A) (5).[2] The hearing committee issued supplemental findings and a report on August 19,

---

DR 2-110, DR 5-102, and DR 5-105.

"(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102 (B)."

"DR 7-102. Representing a Client Within the Bounds of the Law.

"(A) In his representation of a client, a lawyer shall not: . . .

"(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law. . . .

"(5) Knowingly make a false statement of law or fact. . . .

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

"(B) A lawyer who receives information clearly establishing that:

"(1) His client has, in the course of representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal, except when the information is protected as a privileged communication."

[2]The hearing committee had made no ruling on the alleged violation of DR 7-102 (A) (5).

1996, finding that the respondent's conduct, and therefore his violation of DR 7-101 (A) (1), (2), and (3), was intentional, that he knowingly violated DR 7-102 (A) (2), and that he had not violated DR 7-102 (A) (5). The committee also noted that the respondent had knowingly violated DR 7-102 (A) (7). On May 29, 1997, the appeal panel issued its report, adopting the initial and supplemental findings of the hearing committee and upholding the hearing committee's rulings that the respondent had violated Canons 6 and 7. The appeal panel disagreed with the hearing committee's dismissal of the alleged violations of Canon 1, and ruled that the respondent had violated DR 1-102 (A) (4), (5), and (6). The appeal panel recommended a two-year suspension, and suggested that "the respondent complete continuing legal education courses in ethics, and pass the MPRE between the date of suspension and any petition for reinstatement."

On July 14, 1997, the board voted unanimously to adopt the appeal panel report and recommended discipline. The board filed an information in the county court on September 2, 1997, and a single justice of this court suspended the respondent for two years on December 3, 1997, from which the respondent appeals. We vacate the decision of the single justice and order that the respondent be suspended for a period of three years.

1. We summarize the extensive facts found by the hearing committee and upheld by the appeal panel. Some details of other cases related to the one giving rise to the discipline sought here illuminate the challenged conduct of the respondent.

The respondent was admitted to the bar of the Commonwealth in 1952, and has represented Kourouvacilis in a number of matters, including a 1981 divorce; a personal injury and property damage suit arising from an automobile accident in 1983; a wrongful discharge case filed in December, 1987; and the automobile fire suit against GM and Avis at issue here, filed in October, 1988. In July, 1983, Kourouvacilis was involved in an automobile accident while driving a Chevrolet automobile that she had purchased from Avis in 1979.[3] The respondent agreed to represent Kourouvacilis on a contingent fee basis in a suit against the other driver, and, in June, 1984, filed suit on behalf of his client. The complaint alleged that the automobile had been seriously damaged in the 1983 accident, that it was unsafe to drive, and that as a result of the accident Kourouvacilis was

---

[3]The Chevrolet automobile had over 17,000 miles on the odometer when Kourouvacilis purchased it.

being treated for migraine headaches by Dr. Lawrence Metz. The respondent later settled that case by negotiating payments of the policy limits from the insurers of both Kourouvacilis and the other driver.

In August, 1984, Kourouvacilis was discharged from employment at Monson State Hospital (Monson) for excessive absenteeism. In November, 1987, the respondent agreed to represent Kourouvacilis, again on a contingent fee basis, in a wrongful termination suit against the Commonwealth and Monson (Monson suit).[4] In December, 1987, he filed a suit on her behalf that was still pending at the time of respondent's hearing in this disciplinary matter.

In or about November, 1985, the Chevrolet automobile that Kourouvacilis purchased from Avis caught fire while she was operating it; the car was destroyed. The respondent agreed to represent Kourouvacilis on a contingent fee basis in the suit against GM and Avis. The respondent failed adequately to investigate the cause of the automobile fire,[5] and failed to have the automobile inspected by an expert before Kourouvacilis's insurer sold it for salvage. Nonetheless, the suit against GM and Avis raised warranty, negligence, deceit, fraud, and G. L. c. 93A claims, specifically alleging that the fire was caused by "defective wiring."[6]

Neither did the respondent investigate his client's claims of personal injury. When he first agreed to represent her, Kourouvacilis made no claims of physical injury, or that she had sought medical treatment as a result of the fire. The fire department official's report similarly stated that Kourouvacilis had suffered

[4]This suit also alleged a claim against the American Federation of State, County, and Municipal Employees (AFSCME), Kourouvacilis's union, alleging a violation of its duty to her of fair representation.

[5]Between November, 1985, and April, 1988, the respondent's investigation consisted of two letters to GM seeking a settlement and demand letters to GM and Avis pursuant to G. L. c. 93A. Two and one-half years after agreeing to represent Kourouvacilis in this matter, the respondent wrote to the fire department official responsible for investigating the fire, and received his report in May, 1988. In June, 1988, the fire official left a message for the respondent, stating that he did not remember anything about the fire. The respondent never returned the telephone call, and never spoke directly to the fire official.

[6]The respondent also failed to investigate whether, as Kourouvacilis had told him, the Chevrolet was new at the time she purchased it from Avis. Kourouvacilis also stated that the automobile required only maintenance, in direct contradiction to the allegations of the automobile's unfitness after the 1983 accident.

no injuries.[7] The respondent attempted to document Kourouva-
cilis's alleged injuries through Dr. Metz, alleging that Dr. Metz
treated her for migraine headaches resulting from "smoke
inhalation." Dr. Metz's records, however, indicated that Kour-
ouvacilis last visited his office in February, 1985, nine months
before the fire. Kourouvacilis testified during depositions that
Dr. Metz had treated her for migraines after the fire; the
respondent did not counsel her to correct her misstatements,
even after she was unable to produce documentation of any
postfire treatment.

The respondent also drafted a statement for Walter Grzebian,
a front-end mechanic, stating that, based on his experience and
training, the fire was caused by defective wiring installed by
GM.[8] In a telephone conversation, Grzebian told the respondent
that it was "ridiculous" that he had been subpoenaed to give
deposition testimony because he did not "know anything [about]
the [Chevrolet] or what could cause the fire."

In interrogatories and an affidavit prepared by the respondent,
he falsely represented that expert witnesses were available to
testify in support of Kourouvacilis's claims. He prepared inter-
rogatory answers identifying "Matheson," "Grez," "Lt. Col-
burn, Fire Marshall [sic]," and Dr. Metz as expert witnesses,
despite the fact that he had neither consulted nor retained any of
them as expert witnesses, and knew that none would testify in

[7]The respondent requested a report from Kourouvacilis's counselor at
Springfield Technical Community College, Carol Mathison, on the effects of
the fire on Kourouvacilis's physical condition. Mathison stated that she only
had an "impression" of the effect of the fire on Kourouvacilis, and that Kour-
ouvacilis had a short attention span and poor memory. In her August, 1989,
deposition, Mathison stated that Kourouvacilis had reported no physical injury
from the fire, and that Mathison "could not provide the nexus between the
1985 fire and Kourouvacilis's emotional and academic problems because she
was not qualified to identify the cause of the post-traumatic stress disorder she
observed in Kourouvacilis." She was not retained as an expert.

[8]The respondent had requested that Kourouvacilis obtain statements from
"auto mechanics regarding the cause of [her] fire." She left a message for the
respondent, stating that her mechanic, "Grez," was a front-end and suspen-
sion specialist who did not do wiring or electrical repairs but would be willing
to help. Kourouvacilis drafted a statement for Grzebian, stating that he did not
perform wiring or electrical repairs, but that he had been advised by Kourou-
vacilis that the fire marshal believed the fire had .been caused by defective
wiring. The respondent redrafted this statement without speaking to Grzebian,
removed the qualification about his experience, and substituted the language
discussed above. Grzebian signed the statement and returned it to the
respondent on April 13, 1989.

support of any of his client's claims. In support of his opposition to the defendants' motion for summary judgment, the respondent prepared an affidavit on October 6, 1989, signed by Kourouvacilis, which stated that she had been treated by Dr. Metz after the fire in "October, 1985," and that she had bills that she had received from Dr. Metz for treatment in 1986. He also attempted to file an unsworn statement of "——— Gerz," that he prepared, offering Grzebian's "expert opinion." A judge in the Superior Court allowed the defendants' motion for summary judgment. On appeal we affirmed the entry of summary judgment. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706 (1991).

The respondent also advanced misstatements about Kourouvacilis's employment and alleged wages lost as a result of the fire. In answers to GM interrogatories, he advanced his client's claim that she lost two weeks of wages and her position at "Adral Co." In answers to Avis's interrogatories, he advanced her claim that she had not been employed for two years after the fire because of resulting emotional problems, and that her lost earning capacity totaled $36,000. These statements were not only inconsistent as between GM and Avis, but they contradicted and jeopardized the theory of Kourouvacilis's Monson suit. In that case, Kourouvacilis claimed that she was ready and able to work after her 1984 termination, but had been unable to find work until June, 1986. The respondent advanced these misstatements of his client, and did not counsel her to correct either the misstatements or the inconsistencies.

2. *Sufficiency of the evidence.* The respondent makes numerous challenges regarding the sufficiency of the evidence on which the board concluded that he had violated the several provisions of Canons 1, 6, and 7. Among other challenges, he claims that he did not neglect any legal matter entrusted to him, that he did not fail to represent his client zealously, that he did not advance a claim that was unwarranted under existing law, that his client did not clearly perpetrate a fraud that he was thereby required to reveal, and that he did not counsel or assist his client in conduct that he knew to be illegal or fraudulent. We have reviewed the entire record and are satisfied that there was more than adequate evidence to support each of the violations. We see no reason to provide a point-by-point rebuttal to the respondent's arguments.

3. *Authority of the panel.* The respondent challenges the

authority of the appeal panel to reverse the hearing committee's finding that he did not violate DR 1-102 (A) (4), (5), and (6). The appeal panel erred, he claims, because these violations require a determination of intent, a matter within the province of the hearing committee as the "sole judge of the credibility of the testimony presented at the hearing." *Matter of Saab*, 406 Mass. 315, 328 (1989). Supreme Judicial Court Rule 4:01, § 8 (3), as appearing in 381 Mass. 784 (1980), states:

> "The Board may adopt the findings of fact submitted by the hearing committee or the panel or revise such findings which it determines to be erroneous, paying due respect to the role of the hearing committee or the panel as the sole judge of the credibility of the testimony presented at the hearing."[9]

The appeal panel noted specifically that it was authorized to make the revision "since it does not involve the determination of the credibility of any witness's testimony." We are satisfied that the appeal panel's amendment of the hearing committee's report was proper, and involved no credibility determination. Rather, in our assessment, the appeal panel rightfully corrected errors it concluded the hearing committee had made in applying its findings to the disciplinary rules at hand. The appeal panel concluded that the respondent:

> "(1) prepared and served opposing counsel with discovery material and pleadings based on false statements of fact the respondent knew to be false; (2) fraudulently procured affidavits; (3) permitted deposition testimony to stand uncorrected when he knew it contained false statements; and (4) engaged in conduct that delayed litigation, complicated discovery, and wasted the time and resources of the courts."

---

[9]We amended this rule, effective July 1, 1997. The substance of the rule is now contained in S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997), and states in part:

> "The Board shall review, and may revise, the findings of fact, conclusions of law and recommendation of the hearing committee . . . paying due respect to the role of the hearing committee . . . as the sole judge of the credibility of the testimony presented at the hearing."

The hearing committee's initial and supplemental findings contained more than adequate support for the conclusion that this behavior constituted "fraudulent, dishonest conduct which was prejudicial to the administration of justice, and reflected adversely upon the respondent's fitness to practice in violation of DR 1-102(A)(4), (5), and (6)."[10]

4. *Appropriate discipline.* The respondent argues that a two-year suspension of his license is a "miscarriage of justice and grossly disparate." We disagree. In bar discipline cases, we "inquire whether the judgment is markedly disparate from those ordinarily entered by the various single justices in similar cases." *Matter of Clooney*, 403 Mass. 654, 658 (1988), quoting *Matter of Alter*, 389 Mass. 153, 156 (1983). The "primary factor" in bar discipline is "the effect upon, and perception of, the public and the bar." *Matter of Finnerty*, 418 Mass. 821, 829 (1994), quoting *Matter of Alter, supra*.

The facts of this case establish that the respondent engaged in a " 'persistent and extended pattern of improper and unethical behavior' of the sort that would justify a suspension." *Matter of Saab, supra* at 325, quoting *Matter of McInerney*, 389 Mass. 528, 531 (1983). The respondent neglected his client's case. He prosecuted a frivolous claim, needlessly consuming the resources of the judicial system for several years. He filed false and misleading affidavits and interrogatory answers.

The appeal panel concluded that a two-year period of suspension from the practice of law was appropriate. It did so reasoning "[t]he existence of prior discipline, unlike the absence of prior discipline, is a 'substantial factor in selecting the level of discipline.' " *Matter of Dawkins*, 412 Mass. 90, 96 (1992), quoting *Matter of Bryan*, 411 Mass. 288, 291 (1991). "We consistently have considered a record of past misconduct, even if unrelated to the current charges, in determining the appropriate sanction." *Matter of Dawkins, supra*, and cases cited. The existence, as well as the timing, of the respondent's prior disciplinary record persuades us that a suspension longer than that imposed by the single justice is appropriate.

[10]The respondent also argues that S.J.C. Rule 4:01, § 8 (3), as appearing in 381 Mass. 784 (1980), is unconstitutional because it allows an attorney to be punished on proof by a preponderance of the evidence as opposed to "clear and convincing evidence." "[B]ar discipline charges need only be proven by a preponderance of the evidence," *Matter of Budnitz*, 425 Mass. 1018, 1018 n.1 (1997), citing *Matter of Mayberry*, 295 Mass. 155, 167 (1936), and the respondent's constitutional claim is without merit.

The respondent was publicly censured in 1989 for charging a fee in excess of the fee set out in the contingent fee agreement. He refused to turn over the portion of the recovery to which the client was entitled, and withheld funds from the client to pay another attorney without his client's consent. *Matter of Kerlinsky*, 406 Mass. 67 (1989). That the respondent continued to engage in the unethical behavior at issue in this case during the pendency of and subsequent to his earlier disciplinary proceedings warrants more severe discipline.[11] His earlier public censure obviously was not sufficient to dissuade him from engaging in further unethical behavior.

In *Matter of Tobin*, 417 Mass. 81 (1994), we last surveyed cases in which three-year suspensions were imposed. In that case, we reduced a three-year suspension imposed by a single justice to eighteen months.[12] *Id.* at 91. We noted that "[t]hose attorneys who had not been convicted of crime yet received three-year suspensions demonstrated a pattern of neglect and deceit or misused substantial sums of clients' funds." *Id.* at 89 n.8. We are satisfied that the respondent's conduct in this case rises to the level of a "pattern of neglect" warranting a three-year suspension. *Id.* Since *Tobin*, a single justice has imposed a three-year suspension in *Matter of Dittami*, 12 Mass. Att'y Discipline Rep. 98 (1996), which we view as analogous to the present case. In that case, the attorney engaged in conflicts of interest while mediating a business dispute and made written misrepresentations while defending himself in a civil action. *Id.* at 101. The respondent in that case, as in this case, previously had received a public censure. *Id.* at 113. Although the board in that case, as it did here, recommended a two-year suspension, the single justice increased the suspension to three years. *Id.* at 98, 101. While we note that many of the cases in which three-year suspensions have been imposed involve criminal convictions, we reiterate our observation in *Tobin* that such a suspension may be appropriate where, as here, the respondent has engaged in behavior that demonstrates a "pattern of neglect or deceit." *Matter of Tobin, supra.*

---

[11]Bar counsel commenced the initial disciplinary proceedings against the respondent on September 26, 1986, which resulted in the public censure affirmed by *Matter of Kerlinsky*, 406 Mass. 67 (1989).

[12]The respondent in *Tobin* had, among other violations, "intentionally and fraudulently induced the complainant to retain him for unnecessary probate services." *Matter of Tobin*, 417 Mass. 81, 91 (1994).

We are persuaded that an increase in the period of suspension is appropriate based on the number of violations the respondent committed both here and in his earlier disciplinary case. "The simultaneous consideration of separate violations . . . is an established part of the disciplinary system of this Commonwealth." *Matter of Saab, supra* at 326. The board found that the respondent violated ten separate disciplinary rules in this case and six in the earlier case. *Matter of Kerlinsky, supra* at 71-72. The cumulative effect of these violations further supports our conclusion that an additional period of suspension is appropriate. The board concluded, accurately in our view, that the "respondent lacks any appreciation that his behavior was improper and violated the Canons of Ethics." "[I]mposing any sanction less severe . . . would 'undermine[] the clear standards of [*Matter of the Discipline of an Attorney*, 392 Mass. 827 (1984)], and, in the process . . . diminish[] the court's credibility in an area where the public interest requires steadfast protection of clients' rights.' " *Matter of Dawkins, supra* at 97, quoting *Matter of Driscoll*, 695, 705 (1991) (Greaney, J., dissenting).

The decision of the single justice is vacated and a judgment is to be entered in the Supreme Judicial Court for the county of Suffolk ordering that the respondent be suspended from the practice of law for a three-year period.

*So ordered.*