## In the Matter of William A. Murray, Third.

Suffolk. October 6, 2009. - February 2, 2010.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Attorney at Law,* Disciplinary proceeding, Commingling of funds, Suspension. *Administrative Law,* Substantial evidence.

Ample evidence supported the findings of the Board of Bar Overseers (board) that an attorney failed to deposit a client's cash in a client trust account; failed to keep proper records of the cash and the disbursements made on the client's behalf; did not make a complete accounting of the cash when requested to do so by the successor guardian; and was ultimately unable to account for a portion of the total funds he received, all in violation of Mass. R. Prof. C. 1.15 (a), (b), (d), and (e); further, there was substantial evidence in the record to support the board's conclusion that the attorney did not misuse the client's funds or convert them to his own use, intentionally or otherwise, and the board's specific finding that there was no deprivation to the client; finally, the board did not err in adopting the hearing committee's findings and conclusion that the attorney did not violate Mass. R. Prof. C. 8.4 (c) by failing to report immediately an amount of the client's cash found in the attorney's office during the proceedings. [879-882]

In the circumstances of a bar discipline matter, the appropriate sanction for an attorney who misplaced cash belonging to a client was a six-month suspension from the practice of law, as well as a requirement that the attorney complete continuing education on proper accounting and record-keeping of client funds. [882-885]

This court held that, in future cases where bar counsel has proved that an attorney received cash that belonged to a client, did not deposit it in a client trust account, and cannot account for a portion of it, a rebuttable presumption will be created that the attorney misused client funds and that the client was deprived of the funds permanently, with the burden shifting to the attorney to explain what became of the funds. [885-888]

Information filed in the Supreme Judicial Court for the county of Suffolk on July 30, 2008.

The case was reported by *Cowin,* J.

*Dorothy Anderson,* Assistant Bar Counsel.

*Roy A. Bourgeois* for the respondent.

Cowin, J. In this bar discipline case, the respondent received

cash belonging to an elderly client but did not make a record of the total amount received and did not deposit the money in a client trust account. Instead, he placed the cash in a fireproof safe in his office. Thereafter, he spent a substantial part of the money for the client's benefit, and misplaced but later discovered some of the remaining money; no records account for another portion of the cash. For these events, the Board of Bar Overseers (board) has recommended a two-month suspension.

We must determine the appropriate burden of proof and the proper sanction to be imposed where an attorney has misplaced cash belonging to a client, without the intention of depriving the client of the funds, and where a portion of the cash has never been accounted for by the attorney. Bar counsel urges us to treat the case as one of intentional misuse; to place the burden on the attorney to establish that no misuse took place; and, failing a satisfactory explanation, to disbar the respondent or, alternatively, to suspend him from the practice of law for at least one year and one day. The respondent contends that, although he cannot account for a portion of the money he received, he did not misuse the cash; the burden of proof remains always with bar counsel; and, as the hearing committee recommended, he should be sanctioned by a public reprimand.

The burden to prove facts that establish an ethical violation and that provoke enforcement of the disciplinary rules is usually allocated to bar counsel. Here, bar counsel has proved that the respondent received cash that belonged to the client, did not deposit it in a client trust account, and cannot account for a portion of it. With these facts established, we state, for prospective application only, that, in such circumstances, a rebuttable presumption is created that the attorney misused client funds and that the client was deprived of the funds permanently. At this point in the analysis, consistent with burdens that apply to other fiduciary relationships, the burden of explaining what became of the funds shifts to the attorney. While we do not apply this change of approach to the present case, we determine separately that the board's recommendation of a suspension of two months is unreasonably lenient on the facts found, and we impose instead a suspension of six months.

1. *Facts and procedural history.* Bar counsel filed a petition for discipline pursuant to S.J.C. Rule 4:01, § 8 (3), as amended,

435 Mass. 1301 (2002), alleging that the respondent commingled the funds of his elderly client and intentionally converted that money to his own use in violation of several ethical rules.[1,2] The hearing committee made the following findings of fact, which were adopted by both the appeal panel and the board.

The respondent was admitted to the bar of the Commonwealth in 1975. In the summer of 2002, the respondent did some work for the client, an eighty-three year old woman, who sought the respondent's help in putting her financial affairs in order during her husband's last illness. After her husband's death in November, 2002, the client executed a durable power of attorney giving the respondent the power to manage her finances. She was hospitalized shortly thereafter following a collapse in her home. While hospitalized, the client told the respondent to pay her bills from her savings account; she also authorized him to retrieve her checks and mail and to look after her house.

Following implantation of a pacemaker, the client was released from the hospital to a nursing home. Prior to discharging the client to her own home, nursing home staff visited the client's home with the respondent and decided that the home was too filthy and in need of repairs to be habitable.[3] The respondent, who had made the same assessment and had begun cleaning efforts prior to that visit, arranged for the client's home to be

[1]The petition alleged that the respondent violated Mass. R. Prof. C. 1.1, 426 Mass. 1308 (1998) (duty of competence); Mass. R. Prof. C. 1.2 (a), 426 Mass. 1310 (1998) (duty to seek client's objectives through reasonably available, lawful means); Mass. R. Prof. C. 1.3, 426 Mass. 1313 (1998) (duty of diligence); Mass. R. Prof. C. 1.15 (a), (b), (d), and (e), 426 Mass. 1363 (1998) (duty to safeguard client's property and maintain client funds in IOLTA account); and Mass. R. Prof. C. 8.4 (c) and (h), 426 Mass. 1429 (1998) (engaging in conduct involving dishonesty, fraud, deceit, misrepresentation, or "other conduct that adversely reflects on [the lawyer's] fitness to practice law").

[2]Rule 1.15 of the Massachusetts Rules of Professional Conduct, *supra*, was adopted on June 9, 1997, effective January 1, 1998; it was amended on September 5, 2003, effective as of July 1, 2004. See 440 Mass. 1337 (2004). All references to rule 1.15 here are to the version in effect at the time of these events, prior to the July 1, 2004, amendments. Although the text of the rule was modified in 2004, the substantive requirements of rule 1.15, e.g., to deposit promptly clients' funds in a separate trust account, to notify the client in a timely manner of the receipt of funds in which the client has an interest, and to provide an accounting of those funds on request of the client, remain unchanged.

[3]A significant portion of the mess was attributable to the client's two cats, who had been alone in the house while the client was hospitalized.

cleaned and repaired. The respondent initially paid for these repairs with money he withdrew from the client's savings account ($4,442.85).[4]

On a few occasions within a two-week period, the woman hired to clean the client's home found packets of money in various places throughout the house. She notified the respondent, who came to the house and took the money without counting it in the housecleaner's presence. Instead, the respondent counted the money later and made no record of the amount of cash he received. The hearing committee found that he received between $11,000 and $12,000 in cash. Rather than deposit the money in a bank account, the respondent kept the packets of cash in the drawer of a fireproof filing cabinet (also referred to in the record as a safe) in his office. In addition to the funds from the client's savings account (which were largely exhausted by virtue of the repairs), the respondent used a portion of the money in the packets ($6,723.76) to make various payments on the client's behalf for home repairs, cleaning, payment of bills, and purchase of needed appliances.

After the repairs were completed, the client returned home,[5] but visiting nurses became concerned almost immediately about her ability to dispense the correct dose of her medications. She was deemed incapable of caring for herself, and at the suggestion of an elder services provider organization involved in the client's care, the respondent was appointed as her temporary guardian. This appointment lapsed by its own terms, and the client was determined at that time not to be in need of a guardian. Subsequently, the client was again found incapable of caring for herself, and a judge in the Probate and Family Court Department appointed a different guardian.[6] In response to that guardian's request, the respondent provided certain financial information

[4]The client had authorized the necessary repairs to be made in order to allow her to return home.

[5]The record shows that the finding of the cash and the completion of the repairs took place within an approximately two-week period, between January 27, 2003, when the housecleaner began work, and February 9, 2003; the client returned home on February 10, 2003.

[6]The respondent was appointed only as temporary guardian of the client's person; the second guardian was eventually appointed as permanent guardian of the client's person and estate.

pertaining to the client but did not disclose the existence of the cash that had been found hidden in the client's house.

Several months later, the guardian learned from the house-cleaner of the existence of the hidden money. The guardian questioned the respondent about the cash, and the respondent informed her that he had kept the money in a drawer in his office, had used most of it on the client's behalf, and had returned the balance to the client. The respondent said he had counted the money, but at that point he was not asked to reveal how much he had received.

The guardian subsequently demanded that the respondent provide an accounting of the funds. The respondent furnished an itemized list of expenditures made on the client's behalf, with an accompanying letter stating that he had returned the remainder of the funds to the client after deducting the $850 fee she had authorized for his services. Contrary to the respondent's representations in this letter, as well as his testimony before the hearing committee, the respondent had not returned the remainder of the money to the client.[7] The guardian was dissatisfied with the respondent's letter because it did not state the total amount of cash the respondent had received from the housecleaner. She demanded that the respondent give her all the client's remaining cash or she would report him to the board; she also notified the elder services provider of the situation.[8] The guardian filed a complaint with the board, and bar counsel's investigation followed.

---

[7]While the hearing committee did not credit the respondent's testimony that he had returned $1,500 to the client, it also did not find his testimony "intentionally false" and did not find that he "intentionally kept" the balance of the money for himself. Earlier in the proceedings, the respondent had estimated the remaining amount as "a small amount . . . like $1,500, . . . $2,000 maybe, something in that vicinity," and "[not] much . . . [m]aybe $1,000."

According to bar counsel's calculations, based on expenditures made and cash withdrawn from the client's savings account, $1,386 remains unaccounted for ($4,442.85 from the savings account plus $11,000 cash minus $11,166.61 in recorded expenses minus $850 retained as a fee by the respondent minus $2,040 in later-discovered packets that had fallen behind a drawer in the respondent's office safe [discussed *infra*]). However, as the hearing committee found, due to the lack of records it is impossible to determine the exact amount of cash hidden by the client or received by the respondent. This is precisely the problem that is likely to arise any time cash is involved, and that Mass. R. Prof. C. 1.15 is designed to avoid. See part 4, *infra*.

[8]At that point, the elder services provider, the permanent guardian, and the nursing home were involved in a dispute with the respondent concerning the

During the proceedings, the discovery of additional cash was revealed. The respondent testified to the hearing committee that eight months previously, he had discovered two packets containing $2,040 of the client's cash and that this was some of the money he had earlier received from the housecleaner. The packets had slipped behind the upper file drawer in his safe. When he discovered the packets, the respondent immediately notified his attorney; he recognized their evidentiary value in both the civil action and the disciplinary proceedings, and sought legal advice on how to handle them.

At that time, the respondent's first attorney was in the process of withdrawing from the case because of ill health and advised the respondent to discuss the issue with successor counsel. Although the respondent immediately sought new counsel, successor counsel did not accept the case for several months, and required several additional months before he was able to advise the respondent on what to do with the cash. The respondent then informed bar counsel of his discovery and paid the guardian by check an amount equivalent to these funds, plus interest. The hearing committee believed the respondent's testimony, finding that the $2,040 in the packets was recently discovered and was a "misplaced portion" of the cash that the respondent had received from the housecleaner. See part 2, *infra*.

The hearing committee concluded that the respondent committed a breach of his ethical obligations by failing to deposit his client's funds in a trust account; failing adequately to account for the funds to the client or to her guardian; and negligently failing to safeguard the client's property and turn it over to the client or

---

guardian's efforts to sell the client's home. As a member of the nursing home staff testified, the client was adamant that she did not want her home sold. It had been built by her husband in 1958 and she had lived there for many years. The client contacted the respondent when she read about the proposed sale in the newspaper and asked him to represent her in opposing the sale. The respondent agreed to do so, but after he filed an appearance in the Probate and Family Court, the guardian informed the court that the client was incompetent to hire an attorney. The court eventually appointed a guardian ad litem who approved the sale. The hearing committee relied on these events as evidence that the respondent had acted out of sincere concern for the client. During this period, the elder services provider organization initiated a civil action against the respondent in the Probate and Family Court, alleging conversion and seeking an accounting. When this action was dismissed on grounds of lack of standing, the guardian filed a similar action in the Superior Court. See part 2, *infra*.

her guardian. See Mass. R. Prof. C. 1.1, 426 Mass. 1308 (1998); Mass. R. Prof. C. 1.2 (a), 426 Mass. 1310 (1998); Mass. R. Prof. C. 1.3, 426 Mass. 1313 (1998); Mass. R. Prof. C. 1.15 (a), (b), (d), (e), 426 Mass. 1363 (1998).[9] However, the hearing committee concluded that bar counsel had not presented sufficient evidence to support a finding that the respondent had commingled the client's funds with his own; that he had intentionally kept any unreturned balance for himself; or that he had misused or converted the funds, "intentionally or otherwise."[10] See Mass. R. Prof. C. 8.4 (c), (h), 426 Mass. 1429 (1998).

The hearing committee recommended that the respondent be sanctioned by a public reprimand, and bar counsel filed an objection to the hearing committee's report. An appeal panel of the board adopted the hearing committee's findings of fact and conclusions of law, but recommended a sanction of two months' suspension.[11] The board adopted the report and recommendation

---

[9]Rule 1.15 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1363 (1998) (see note 2, *supra*), provides in pertinent part: "(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from a lawyer's own property. Funds shall be kept in a separate account maintained in the State where the lawyer's office is situated, or elsewhere with the consent of the client or third person. . . ." "(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." . . . "(d) All funds held in trust by lawyer or law firm, other than advances for costs and expenses, shall be deposited in accounts clearly identified as 'trust accounts,' 'escrow accounts,' 'client funds accounts,' 'conveyancing accounts,' or 'IOLTA accounts' or with words of similar import indicating the fiduciary nature of the account. . . ." "(e) Each lawyer who has a law office in this Commonwealth and who holds trust funds shall deposit such funds, as appropriate, in one of two types of interest-bearing accounts; either (i) a pooled account ('IOLTA account') for all trust funds which in the judgment of the lawyer are nominal in amount, or are to be held for a short period of time, or (ii) for all other trust funds, an individual account with the interest payable as directed by the client. . . ."

[10]Specifically, the hearing committee cited bar counsel's failure to present any evidence "that the respondent deposited [the client's] money into his own personal, business or trust accounts, that the balances in those accounts were so low that he needed to use [the client's] money, or that he was over-burdened with debt."

[11]The third member of the appeal panel wrote a lengthy dissent stating that,

of the appeal panel over bar counsel's objections and filed an information in the county court.[12] After a hearing, the single justice reserved and reported the case, without decision, to the full court. See S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997). Bar counsel seeks either disbarment or suspension for at least one year and one day. The respondent requests that we impose the public reprimand recommended by the hearing committee.

2. *Sufficiency of the evidence.* "In bar discipline cases that have been reserved and reported, we 'review the board's findings and reach our own conclusion.' " *Matter of Wainwright,* 448 Mass. 378, 384 (2007), quoting *Matter of Fordham,* 423 Mass. 481, 487 (1996), cert. denied, 519 U.S. 1149 (1997). The findings and recommendations of the board, although not binding on this court, are "entitled to great weight." *Matter of Fordham, supra,* citing *Matter of Hiss,* 368 Mass. 447, 461 (1975). We accept "subsidiary facts found by the [b]oard" if they are "supported by substantial evidence, upon consideration of the record." S.J.C. Rule 4:01, § 8 (4).

As stated, we do not apply the rebuttable presumption that we establish today in the present case. We thus turn to the question whether there was substantial evidence to support the board's findings on the existing record. See *Matter of Segal,* 430 Mass. 359, 364 (1999), quoting G. L. c. 30A, § 1 (6) (" 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion"). "While we review the entire record and consider whatever detracts from the weight of the board's conclusion, as long as there is substantial evidence, we do not disturb the board's finding, even if we would have come to a different conclusion if considering the matter de novo." *Matter of Segal, supra.* Because the board's findings here (adopting all the hearing committee's findings) are supported by the evidence, we accept those findings.

There was more than ample evidence in this case to support the board's findings that the respondent failed to deposit the

as suggested by the hearing committee, the appeal panel should have recommended a public reprimand.

[12]Three members of the ten-member board voted against adopting the two-month suspension recommended by the appeal panel; two voted for lesser discipline and one voted for greater discipline.

client's cash in a client trust account; failed to keep proper records of the cash and the disbursements made on the client's behalf; did not make a complete accounting of the cash when requested to do so by the successor guardian; and was ultimately unable to account for a portion of the total funds he received. Indeed, the respondent admitted that he stored the cash in his office safe and that he did not know the exact amount he received. Therefore, the board concluded correctly that the respondent violated Mass. R. Prof. C. 1.15 (a), (b), (d), and (e).

Absent the presumption that is to be applied in the future, there is also substantial evidence in the record to support the board's conclusion that the respondent did not misuse the client's funds or convert them to his own use, "intentionally or otherwise." The respondent's testimony that he had not intentionally misused the client's funds or converted them to his own use, together with a lack of contrary evidence offered by bar counsel, see notes 7 and 10, *supra*, is sufficient to support the hearing committee's finding that the respondent did not misuse the funds. The hearing committee, as the sole judge of the credibility of the witnesses, see S.J.C. Rule 4:01, § 8 (4); *Matter of Concemi*, 422 Mass. 326, 328 (1996), was entitled to believe the respondent's testimony. The hearing committee's credibility determinations "will not be rejected unless it can be 'said with certainty' that [a] finding was 'wholly inconsistent with another implicit finding.' " *Matter of Barrett*, 447 Mass. 453, 460 (2006), quoting *Matter of Hachey*, 11 Mass. Att'y Discipline Rep. 102, 103 (1995).

The evidence here, while subject to various interpretations, also supports the board's specific finding that there was no deprivation to the client. See *Matter of Driscoll*, 447 Mass. 678, 685 (2006), citing *Matter of Orfanello*, 411 Mass. 551, 556 (1992) ("we will not draw an independent inference . . . when the facts are subject to several interpretations, particularly where the board declined to accept bar counsel's version of events"). "There is deprivation of a client's funds whenever an attorney uses client funds for unauthorized purposes after the time these funds are due and payable." *Matter of Carrigan*, 414 Mass. 368, 373 n.6 (1993). The board found that, although the respondent's testimony "display[ed] incomplete accounting," bar counsel had established only that the respondent "lost track" of some of the

cash, and not that the client had been deprived of the money. See *Matter of Gonick*, 15 Mass. Att'y Discipline Rep. 230, 234 (1999) (we "look to the [board's] findings concerning the respondent's intent and whether the client was deprived of funds"). The only funds that the board found to be temporarily "misplaced" were the $2,040 from the later-discovered packets that were eventually turned over to the guardian with interest. See *Matter of Abromovitz*, 23 Mass. Att'y Discipline Rep. 6, 6-8 (2007) (commingling without misuse or deprivation where attorney negligently failed to remit money owed to client from settlement proceeds, failed to notify client promptly of his receipt thereof because of his failure to maintain adequate records, held money for several years, and failed to investigate records and reconcile account after client demanded missing funds, but ultimately repaid money plus accrued interest). Contrast *Matter of Schoepfer*, 426 Mass. 183, 184-185, 188 (1997) (deprivation where attorney repeatedly and intentionally used client's funds for attorney's personal expenses after withdrawing money from trust account and depositing it in attorney's personal account).

We next consider the respondent's failure to report immediately or turn over to the guardian the $2,040 that he discovered in late spring of 2006 behind a drawer in his safe. Bar counsel argues that we should overturn the hearing committee's findings and conclusion that the respondent did not violate Mass. R. Prof. C. 8.4 (c) by failing to report immediately the newly discovered cash. The hearing committee concluded that there was no violation because the respondent had no intent to mislead, see *Matter of Provanzano*, 5 Mass. Att'y Discipline Rep. 300, 301-302 (1987), and no knowledge that "anyone would rely on incomplete or misleading information in connection with" the delay, see *Matter of McCabe*, 13 Mass. Att'y Discipline Rep. 501, 511-512 (1997).

The hearing committee and the appeal panel each based its conclusions on the hearing committee's findings that the respondent lacked the required mental state and had no specific intent to deceive. Both the hearing committee and the appeal panel emphasized that the respondent immediately sought advice from his attorney on how to handle the money. Because of his first counsel's ill health, he had to obtain new counsel during that time period (in the midst of the disciplinary proceedings). Due to

the complications of the multiple proceedings against the respondent, successor counsel considered how to handle the cash for several months after accepting the case. The appeal panel concluded that four months of the eight-month delay were attributable to the respondent's failure to "press" his prior counsel for an answer and for allowing successor counsel to put the issue on the "back burner."

The hearing committee's determination of intent is treated as a determination of credibility. See, e.g., *Matter of Gonick, supra* at 234. See also *Matter of Driscoll, supra* at 685-686. The testimony supports the hearing committee's finding concerning the respondent's state of mind. In addition to the respondent's testimony on this issue, successor counsel testified at the bar disciplinary proceeding that he was told by prior counsel of the discovery of the cash several months before he accepted the case, and that, once he filed his notice of appearance, the respondent was continually "pestering" him about what to do with that money.[13] Because the testimony supports the hearing committee's findings on this issue, we accept the finding that there was no violation of Mass. R. Prof. C. 8.4 (c).

3. *Appropriate sanction.* In the interest of fairness, we have previously declined to apply a newly developed level of sanction to an attorney in the disciplinary proceeding in which it was announced, see *Matter of the Discipline of an Attorney,* 392 Mass. 827, 835 (1984) (*Three Attorneys*). Although we announce a new rule concerning the handling of client cash in part 4, *infra,* we conclude that, in the circumstances of this case, to apply that sanction retroactively would be inappropriate. Therefore, we consider the board's recommended sanction under the rules in effect when the board reached its recommendation.

Our review of the board's recommended sanction is "de novo, but tempered with substantial deference to the board's recommendation." *Matter of Jackman,* 444 Mass. 1013, 1013 (2005), quoting *Matter of Foley,* 439 Mass. 324, 333 (2003). In determining whether the sanction imposed by the board is appropriate, we generally consider whether the board's recommendation is

---

[13]The cash itself was subsequently used in the disciplinary proceedings for purposes of demonstrating its age and musty condition. It played a critical role in the hearing committee's findings.

"markedly disparate" from the sanction imposed in other similar cases. See *Matter of Griffith*, 440 Mass. 500, 507 (2003). Nonetheless, "[e]ach case must be decided on its own merits and every offending attorney must receive the disposition most appropriate in the circumstances." *Three Attorneys, supra* at 837. An increased sanction may be appropriate where the attorney has a prior history of discipline, even if the prior misconduct is unrelated to the present charges. See *Matter of Dawkins*, 412 Mass. 90, 96 (1992), and cases cited.

Here, the board determined, see note 1, *supra*, that the respondent violated Mass. R. Prof. C. 1.1; 1.2 (a); 1.3; and 1.15 (a), (b), (d), and (e), by his failure to provide competent representation; to obtain the lawful objectives of his client through reasonably available and permissible means; to act with reasonable diligence; to safeguard adequately the client's funds in an interest-bearing trust account; to keep complete records of the money; to account adequately for those funds upon request; and to turn over those funds to the client or her guardian in a timely manner. These conclusions are well supported by the record.

Notwithstanding the respondent's previous relationship with his client, the fact that the respondent did not benefit from the misconduct, and the respondent's sincere efforts to assist the client, no reasonable attorney could believe that holding $11,000 to $12,000 in cash in an office safe, without making a proper record of the amount involved and without communicating with the client about the money, could constitute proper management of the client's funds. The board determined correctly that the respondent's negligent handling of the client's cash, and his failure timely to turn over the $2,040 to the client or her guardian, was in violation of Mass. R. Prof. C. 1.15 (a), (b), (d), and (e).

The sanction for similar misconduct in previous cases has been a public reprimand. See, e.g., *Matter of Abromovitz*, 23 Mass. Att'y Discipline Rep. 6, 6-8 (2007) (stipulation to public reprimand where attorney negligently failed timely to remit $12,000 owed to client from settlement proceeds, failed to notify client promptly of his receipt thereof because of his failure to maintain adequate records, and failed to investigate records and reconcile account after client demanded missing funds); *Matter of McCarthy*, 21 Mass. Att'y Discipline Rep. 471, 472-473 (2005) (stipulation to

public reprimand where attorney commingled and negligently misused client funds without actual deprivation or intent to deprive, and failed to keep adequate records of those funds).

However, the board, adopting the recommendation of the appeal panel, rejected the hearing committee's recommendation of a public reprimand and recommended that the respondent be suspended from the practice of law for two months. The board considered as an aggravating factor the respondent's prior history of discipline in an unrelated case wherein he received a private admonition for failing timely to probate the estate of his client's relative, failing to communicate with the client regarding the status of the estate, and failing to cooperate with bar counsel's investigation. See *Admonition No. 03-61*, 19 Mass. Att'y Discipline Rep. 636 (2003). The board also considered in aggravation the respondent's failure for nearly eight months to notify either the guardian or bar counsel of his discovery of the additional $2,040 of the client's cash.

Although the board's findings concerning the respondent's violations of the ethical rules are well supported, we conclude that the board's recommendation of a two-month suspension is inadequate. The respondent has received prior discipline (a private admonition) for failing timely to probate. The board properly considered this factor in aggravation. Furthermore, the respondent's eight-month delay in bringing his discovery of $2,040 of the missing cash to the attention of his client, her guardian, or bar counsel is troubling. While the hearing committee determined correctly that this conduct violated Mass. R. Prof. C. 1.15 (a) and (b), neither the hearing committee nor the board accorded sufficient weight to this factor.

That the respondent relied on advice of counsel in holding onto the funds for their potential evidentiary value in both the civil proceeding and this disciplinary proceeding does not excuse the delay. Reliance on the advice of counsel is not a defense to a charge of unethical conduct. See *Matter of Lupo*, 447 Mass. 345, 357 (2006). Moreover, the respondent is not an inexperienced attorney. Notwithstanding that the appeal panel found that only four months of the delay were attributable to the respondent, who was attempting to obtain a new attorney at that time, a delay of the remaining four months, given an elderly client and the

guardian's explicit request for an accounting of all of the cash, is unacceptable. More importantly, the delay resulted from the respondent's decision to place his interest in defending himself in the legal proceedings over his client's interests.

Nonetheless, the circumstances of this case appear to be unusual in the history of bar discipline in the Commonwealth. Although the board declined to do so, we consider in mitigation the respondent's sincere efforts on behalf of the client. Applying the appropriate weight to both the aggravating and mitigating factors, we reject the board's recommendation and conclude that a six-month suspension should be imposed in this case.

As part of the respondent's prior discipline, he was required to take a continuing education class of bar counsel's choosing. Although the hearing committee in the present case found that the respondent was not unaware of basic ethical guidelines, we conclude that the record makes it apparent that he is in need of additional education on proper accounting and record-keeping of client funds. Therefore, we conclude that the sanction should also include such a requirement.

4. *Future cases involving client cash.* The hearing committee and the appeal panel rejected bar counsel's argument that the respondent should bear the burden of establishing that he did not misuse the client's cash. Instead, they concluded that the burden remained with bar counsel to show that the respondent had misused the client's funds or otherwise dealt with such funds improperly; and, further, that bar counsel had failed to meet this burden.

Ordinarily, as bar counsel concedes, the burden of proof rests with bar counsel to establish a violation of a disciplinary rule. *Matter of Balliro*, 453 Mass. 75, 84 (2009), citing Rule 3.28 of the Rules of the Board of Bar Overseers (2006) and *Matter of Driscoll*, 447 Mass. 678, 685 (2006). However, bar counsel contends that, in the present circumstances, the board erred in placing the burden on her to establish that the respondent misused the cash. Bar counsel advocates adoption of a rule stating that when it is established that an attorney received client funds in the form of cash, failed to keep a record of those funds, failed to deposit them in a client trust account, and failed to furnish the client with an accounting of the money, the respondent should

bear the burden of proving both the amount he received and that he used the client's funds for her benefit.

The question of the allocation of the burden of proof in a case of this nature (receipt of cash) is not a simple one. It is of course customary in our justice system that the party seeking relief is called on to prove the facts that entitle him or her to the relief. In the present case it is bar counsel who seeks the relief of a determination that the respondent has violated a disciplinary rule and an appropriate sanction therefor. Given the critical nature of an allegation that an attorney has mishandled client funds, one with serious, long-term effects on the standing of a member of a profession that emphasizes character and reputation, it must fall to bar counsel to prove the factual basis for the claim of unethical behavior.

This burden need not extend, however, beyond proof that funds have been received by the attorney and the attorney has neither deposited them in an appropriate bank account nor otherwise provided an adequate accounting regarding their disposition. The failure properly to record and deposit cash, a fungible and generally untraceable asset, and the failure to produce the cash or to make an adequate accounting of its use, is a serious offense that merits far greater sanctions than those that have been previously imposed for negligent accounting and misplaced funds. See, for example, *Matter of McCarthy*, 21 Mass. Att'y Discipline Rep. 471, 472-473 (2005) (negligent mismanagement of client funds without intent to misuse ordinarily punished by public reprimand). An attorney's failure to deposit and keep records of client cash, which cannot then be accounted for, creates the impression that the attorney has misappropriated the cash for the attorney's own use, with severe consequences for the public's perception of attorneys. See *Matter of Foley*, 439 Mass. 324, 337 (2003). Indeed, the very failure to keep adequate records of cash received may render it impossible to determine whether the client was, in fact, deprived of any funds. We conclude that far more serious sanctions are required both to deter attorneys from engaging in such conduct and to encourage public confidence in the legal profession. See *Matter of Driscoll*, 447 Mass. 678, 688 (2006), quoting *Matter of Kerlinsky*, 428 Mass. 656, 664, cert. denied, 526 U.S. 1160 (1999) ("The overriding

consideration in bar discipline is 'the effect upon, and perception of, the public and the bar' ").

Once a showing has been made by bar counsel that client cash has been received, has not been deposited in a bank account, and has not been accounted for, we have no difficulty in holding that it is the respondent attorney's burden to explain what happened to the money. In such circumstances, it is the attorney who will be in possession of, or otherwise have access to, the relevant information, including information that may exonerate him or her with respect to what otherwise appears to be a violation. It is thus not unfair to rely on a presumption, one that can be rebutted, that unaccounted-for cash received from or on behalf of a client is deemed to have been commingled in violation of Mass. R. Prof. C. 1.15 and that the client has been permanently deprived of the money. Our approach to the question does not differ from the allocation of responsibilities that attend other fiduciary relationships such as that of trustee and beneficiary. See Restatement (Second) of Trusts § 172 comment b (1959). See also *Samia* v. *Central Oil Co.*, 339 Mass. 101, 126 (1959).

In adopting this approach, we do not mean to suggest that the distinction between an intent to deprive the client of funds and negligent handling of cash without such an intent has been eliminated. Bar counsel's argument that there is no distinction in the rules of professional conduct between misplacement of client funds, negligent misuse, or misuse with deprivation, "whether intentional or negligent," and that all are simply failures to comply with one or more provisions of Mass. R. Prof. C. 1.15, is unavailing. Although the language of the rule makes none of these distinctions, but merely requires that funds be deposited in a trust account, accounted for, and returned timely to the client on request, our case law has consistently maintained different sanctions for commingling alone, negligent misuse, intentional misuse, and intentional misuse with deprivation. See *Matter of Schoepfer*, 426 Mass. 183, 187 (1997); *Three Attorneys, supra* at 836.

Nor do we seek to render insignificant the question whether a given client has actually been deprived of the funds by the actions of counsel. These continue to be relevant considerations, particularly with respect to the severity of the sanctions; but, once bar counsel has established the operative facts, hereafter it

will be the burden of the attorney to demonstrate whether the funds are indeed missing, whether his actions were intentional or negligent, and whether there has been deprivation. Should an attorney fail to convince that funds are missing by virtue of negligence rather than purpose, deprivation will be presumed, and a sanction of disbarment or indefinite suspension will be imposed. See *Matter of Schoepfer, supra.* Contrast *Matter of Cronin*, 19 Mass. Att'y Discipline Rep. 101, 102-103 (2003) (one-year suspension for attorney who negligently misused client funds resulting in deprivation).

The rule we announce today, and its accompanying sanction, will apply only to cash,[14] and is to be imposed for misconduct occurring after the date of the issuance of the rescript of this opinion. While we recognize that the new rule is harsher than previous treatment for similar behavior, and will also result in far greater sanction where cash is involved than in other violations of Mass. R. Prof. C. 1.15, we conclude that, by its very nature, cash must be treated differently than other client assets. Above all, we "must consider what measure of discipline is necessary to protect the public and deter other attorneys from the same behavior." *Matter of Concemi*, 422 Mass. 326, 329 (1996), citing *Matter of Saab*, 406 Mass. 315, 328 (1989).

5. *Disposition.* A judgment shall enter suspending the respondent from the practice of law in the Commonwealth for six months. During this time, or as soon as practicable thereafter, the respondent shall also be required to take a continuing legal education course, chosen by bar counsel, in accounting and management of client funds.

*So ordered.*

---

[14]In the future, similar sanctions may apply as well to other fungible client property such as jewelry; we refer the matter for consideration by the court's standing advisory committee on the rules of professional conduct.